HARPER v. TRI-STATE MOTORS, Inc., et al.

No. 5473.   Decided May 29, 1936.   (58 P. [2d] 18.)

*A. J. Mays, Leslie Frazer,* and *Thomas & Dahlquist,* all of Salt Lake City, for appellant.

*H. D. Moyle* and *Badger, Rich & Rich,* all of Salt Lake City, for respondents.

WOOLLEY, District Judge.

This is an action brought under the Blue Sky Law to recover a judgment for $1,000, being the sum paid by the plaintiff for 100 shares of capital stock of Richards-Barlow Motor Company, a Utah corporation, the name of which

was changed by an amendment to its articles of incorporation to Tri-State Motors, Inc. The defendants named in the complaint are Tri-State Motors, Inc., a corporation, Ira C. Holbrook, president, and M. R. Richards, secretary, of the corporation. After the action was commenced, a receiver was appointed by the court in another cause for the property of the corporation; the plaintiff filed his claim with the receiver who rejected the same; and the receiver was brought into this case as a defendant by a supplemental complaint. At a trial had before the court, sitting without a jury, the defendants prevailed, the court entered judgment denying plaintiff any relief, and plaintiff appeals.

The Blue Sky Law of this state, the purpose of which is to prevent fraud in the sale of securities, as it stood at the time of the transaction involved in this case (Laws of Utah 1925, c. 87, as amended by Laws of Utah 1929, c. 79) provides that all securities to which the act applies shall be registered with the State Securities Commission and their sale authorized by that body before they are sold or offered for sale to the public; and that every sale or contract for sale made in violation of any of the provisions of the act shall be voidable at the election of the purchaser, who may, upon disaffirming the contract and tendering back the securities, recover a judgment in an action at law in any court of competent jurisdiction for the full amount of the purchase price paid, together with interest, costs, and attorney's fees, against the corporation and all its officers, directors, and agents who made or who participated directly or indirectly in making the illegal sale; their liability being both joint and several. Laws of Utah 1929, c. 79, amending Act 1925, § 18; *Buttrey* v. *Guaranteed Securities Co.*, 78 Utah 39, 300 P. 1040. Any disposition of a security for value is a sale under this statute and so is a subscription contract to the shares of a corporation. See subdivision 3 of section 2, Laws of Utah 1929, c. 79.

It is provided in section 3 that the provisions of the act do not apply to any of nine classes of securities therein men-

tioned, unless they are otherwise expressly brought within its operation; and in section 4 it is provided that the act shall not apply to the sale of any security in any of nine kinds of transactions therein mentioned. Since it is the claim of the defendants in this case that the sale of which the plaintiff complains was made in a transaction to which the Blue Sky Law does not apply, being one which is exempted from its requirements under section 4, we quote so much of that section as is pertinent to the case, as follows:

"Sec. 4. Other securities exempt—revocation of exemption. Except as hereinafter expressly provided the provisions of this Act shall not apply to the sale of any security in any of the following transactions: * * *

"(c) An isolated transaction in which any security is sold, offered for sale, subscription or delivery by the owner thereof, or by his representative for the owner's account, such sale or offer for sale, subscription or delivery not being made in the course of repeated and successive transactions of a like character by such owner or on his account by such representative, and such owner or representative not being the underwriter of such security. The provisions of sub-section (c) of this section shall not apply in any case of sale where the issuer shall have taken the entire stock of a company in payment for mining claims, patent rights, copyrights, trademarks, process, lease, formula, oil lease, good will or any other property right or any other tangible or intangible asset which may be construed as a promotion interest; or where funds received from the sale of such security may be used directly or indirectly for the development of the issuer as herein defined.

"(d) The distribution by a corporation actively engaged in the business authorized by its charter of capital stock, bonds or other securities to its stockholders or other security holders as a stock dividend or other distribution out of earnings or surplus; or the issue of securities to the security holders or other creditors of a corporation in the process of a bona fide reorganization of such corporation made in good faith and not for the purpose of avoiding the provisions of this Act, either in exchange for the securities of such security holders or claims of such creditors or partly for cash and partly in exchange for the securities or claims of such security holders or creditors, or the issue of increased capital stock of a corporation sold or distributed by it entirely among its own stockholders, where no commission or

other remuneration is paid or given directly or indirectly in connection with the sale or distribution of such increased capital stock."

The facts in the case are that at the time of the transaction involved herein the Richards-Barlow Motor Company was a corporation, organized and existing under and by virtue of the laws of this state and engaged in the business of selling automobiles; that its capital stock had not been registered with and the sale thereof had not been authorized by the Securities Commission, nor did such stock fall within any of those classes of securities which are exempted from the operation of the Blue Sky Law by the provisions of section 3 of the act. The defendant Holbrook was president and the defendant Richards was secretary and treasurer of said corporation. The transaction was had directly between Harper and Richards. If Holbrook was implicated therein at all, it was not because of any dealings which he had directly with Harper, but because of his acts and conduct as an officer of the corporation. On or about August 17, 1929, plaintiff Harper and defendant Richards met on Ninth South and State streets in Salt Lake City, where the latter overtook the former, who was returning to his home from a visit to Salt Lake City, and then and there Richards sold to Harper 100 shares of the capital stock of said corporation for the agreed price of $1,000. They had previously talked about the matter. Then and there Harper handed to Richards a check for $1,000 to pay for the stock, but no certificate as evidence of such shares changed hands at that time. The check was made out by Harper with the name of the payee left blank. Richards later that same day wrote in the name of Richards-Barlow Motor Company as the payee. That same day the following entry was made in the cash book of the corporation: "Mrs. P. W. Harper, 100 shares capital stock R. B. M. Company, $1000.00." And the following entry was made in the stock ledger of said corporation under the heading, "Capital stock subscribed to": "August 17, 1929, P. W. Harper, 100 shares." And under the heading "Credits" the entry:

"$1000.00." On October 14, 1929, at the office of said corporation in Salt Lake City, Richards handed to Harper certificate No. 16 for 100 shares of the capital stock of said corporation, which was made out in the name of P. W. Harper as owner and signed by Holbrook as president and Richards as secretary; and at the same time Richards canceled certificate No. 15, which was still attached to the stub in the book of stock certificates and was made out in the name of Richards as owner. At the commencement of this action, Harper indorsed said certificate No. 16 in blank, and in his complaint, in which he alleges that he has elected and does elect to rescind and avoid said sale, he tenders the same to the defendants. As to why a certificate for the shares was not delivered to the purchaser until nearly two months after the sale, both Harper and Richards testified that some time within two or three weeks after August 17th, Harper inquired about the stock, and Richards then told him in substance that Holbrook, the president of the corporation, was out of town and it was necessary to wait for his return to sign the certificate before it could be delivered.

There is no dispute between the parties or conflict in the evidence concerning any of the facts above stated. To avoid, however, the consequences to which those facts, if unexplained, must necessarily lead, the defendants undertook to produce additional evidence to show, as alleged in their answers: First, that Holbrook had nothing whatever to do even indirectly with said sale; and, second, that the same was a sale made by Richards of his own stock in an isolated transaction, being, therefore, one to which the Blue Sky Law does not apply by the express provisions of subdivision (c) of section 4. The evidence pro and con upon those two defenses is in brief as follows: From the minutes of a meeting of the board of directors of said corporation held December 13, 1928, this resolution was produced:

"A suggestion was made by Mr. Holbrook, and received favorable expression from all present, that if a suitable party could be found

that had $2000.00 or $3000.00 to put in the business, and a person who was willing to work and cooperate, who would make a good partner, that he be secured and additional capital put in the business; and that Mr. Richards was authorized to speak to the Willys-Overland factory representative regarding this matter, and see if he knew of a suitable party, and to try and find the right party."

The defendant Richards testified that the foregoing resolution was the only authorization he had from the corporation to sell the shares of stock and that it was by virtue of this authorization that he sold the 100 shares to Harper. But he further testified that between the time of the sale on August 17th and the time of the delivery of the certificate on October 14th, he consulted an attorney about the matter and was advised to sell his own stock instead of company stock; so when Harper came to get the certificate he issued and delivered a certificate for shares to which he (Richards) had previously subscribed. His testimony upon this point as the same is contained in the abstract is as follows:

"At the time of Mr. Harper getting the stock I explained to him that Mr. Holbrook had been out of town, and that I had talked to my attorney about it, and that my attorney had advised me to sell some of my stock; and I showed him the certificate I had, and that I was cancelling my certificate and issuing it to Mr. Harper. I refer to certificate No. 15 in this book, the one just ahead of Mr. Harper's. I showed him that at the time he got his certificate. I showed him that it was in my name, and that I was transferring it to him. I had subscribed for about 500 shares of stock before that. This subscription was in writing, and in the hands of the company. I told Mr. Harper the attorney had told me to issue part of that stock to him, and that is what I actually did." The plaintiff Harper did not deny this testimony as to what Richards said upon the occasion mentioned therein, except he denied that Richards said to him in substance or effect that he was showing him a certificate representing his personal stock, and that Exhibit B, which is certificate No. 16, is the only one he remembered noticing. Richards also testified that in his first conversations with Harper about the matter he was proposing that Harper put in a larger sum of money, possibly between $2,500 and $3,000; and that when Harper came to the office the day the certificate was delivered to him, Richards told him that due to the condi-

tions, where he was not putting in the amount of money the company wanted, he (Richards) did not know what action the board of directors might take about the matter; and that is the reason he gave Harper some of his own stock instead of a regular company certificate. As to why he filled in the blank check so as to make the same payable to the order of the corporation instead of to himself, he testified that "upon my return to the office instead of filling it out in my name and putting it in my bank and giving my check to the corporation, I simply made it out to the Motor Company and gave them the check. Prior to the day this stock certificate was delivered to Mr. Harper I had never suggested to him that it was my personal stock I was selling to him."

The defendant Holbrook testified that he first met Harper about the end of October or early in November; that he left for New York around the 4th of August, and returned to Utah about September 16th; that he did not participate in the transaction with Harper nor have any conversation with him with reference to his becoming a stockholder or subscribing to stock in the corporation; that he first became aware that Harper was a stockholder in the company about October 15th; that at a meeting of the stockholders and directors of the corporation held on September 17, 1929, a stock dividend of 25 per cent. was declared, payable to the original stockholders, Messrs. Holbrook, Barlow, Richards, Roberts, and Coleman, all stockholders of record on the company's books as of July 31, 1929; that the next day he signed a number of stock certificates in blank to be used by the secretary in making the dividend distribution above mentioned; that he was in the state from the date of his return on September 16, 1929, up to and including the 14th of October; that he was contemplating a trip to Hawaii about November, but trouble developed in the affairs of the company and he did not make that trip; that he did not recall signing any stock certificates in blank except those he signed the day after the stock dividend was declared. The stock book was exhibited to him, in which all the certificates remaining therein, up to and including certificate No. 35, bore his signature as president, and that fourteen of them were still blank, and this question was put to him:

"Q. You didn't sign up to and including certificate No. 35 for the purpose of issuing a stock dividend to five stockholders, did you?"

To which he answered:

"I could not tell you just why that was done, because sometimes people want to change stock, and then they may not want their stock all in one certificate."

It was stipulated that prior to July 31, 1929, there had been only six stock certificates issued. The stock book was put in evidence for all purposes by stipulation of counsel. It appears therein that prior to September 18, 1929, M. R. Richards was the owner of 260 shares of stock as evidenced by certificate No. 3 for 250 shares, dated April 1, 1927, and certificate No. 6 for 10 shares, dated August 18, 1927, and on September 18, 1929, certificate No. 11 for 65 shares was issued to Richards; and that certificate No. 15 for 100 shares was made out to Richards on October 14, 1929, and canceled, and certificate No. 16 for 100 shares made out to Harper the same day. Also, according to the stub in this book, certificate No. 18 for 50 shares was issued to Dr. Wm. L. Rich; certificate No. 19 for 100 shares is made out to George A. Allen, but is not detached; the same is true of certificate No. 20, which is made out to Richard Stringham. Certificate No. 21 for 250 shares appears to have been made out to one Orlaf Farr, but upon this certificate is written the following:

"I hereby rescind this transaction and release all parties. Orlaf Farr."

And under this statement the following notation:

"The return of this stock certificate is hereby acknowledged and cancels all obligations of Orlaf Farr. M. R. Richards."

It requires no argument, and none will be made, to show that the sale of the stock by Richards to Harper on August 17, 1929, and as the matter stood thereafter until October 14th of that year, was voidable at Harper's election, because the stock of the corporation had not been registered with

and its sale had not been authorized by the Securities Commission. There is no one in this case undertaking to defend that sale; its illegality is recognized by all parties concerned. The question is whether this bad sale was saved and made good by what Richards said to Harper and did with the books of the corporation on October 14th, when Harper received delivery of the stock certificate.

There are two steps involved in the transaction according to defendants' theory of the case which are to be noticed. There is first the issuance of the stock by the corporation, and, second, the sale thereof to Harper. The corporation had the right, without registering its stock, to distribute shares to its stockholders as a stock dividend out of earnings or surplus; and also to increase its capital stock and to sell or distribute such increase entirely among its own stockholders, if no commission or other remuneration was paid or given in connection with such distribution. Such transactions are excepted from the requirements of the blue sky statute by subdivision (d) of section 4. This is the only way that we know of in which the corporation could issue its shares or dispose of its stock without complying with the registration requirements of the law. There is no attempt made, however, by the defendants to justify the issuance of the 100 shares in question under subdivision (d). All they say about the issuance of the shares is that Richards at some time in the past had subscribed for 500 shares of stock, which we infer he had not paid for, and that when Harper came to the offices of the company to get a certificate evidencing the 100 shares which he had purchased, Richards made out certificate No. 15 for 100 shares to himself against this subscription, then immediately cancelled certificate No. 15 and issued to Harper in lieu thereof certificate No. 16. The validity of this transaction, so far as it concerns the issuance of the shares by the corporation, is not apparent. It rests upon Richards' subscription, which was rescindable at his election, and therefore affords a rather unstable foundation upon which to rest a sale of the stock to the public.

This brings us to the second step, which is the sale of the stock to Harper. The defendant Richards had the right to sell his own stock, without the same having been registered, providing he did so in an isolated transaction and not in the course of repeated and successive transactions of a like character, that he was not an underwriter of such shares, and that the funds received from the sale went into his own pockets and not into the treasury of the corporation. Such a sale is not within the requirements of the Blue Sky Law, but is excepted therefrom by subdivision (c) of section 4. It is this right upon which the defendants stand; this is the door by which they all seek to escape liability in this action. According to their theory and the trial court's findings, this was a sale made by Richards of his own shares in an isolated transaction and in which neither the corporation nor Holbrook took any part. This is a law case and this court is bound by the findings of fact made by the trial court if there is any competent evidence to support them. This court is not bound, however, by the finding above mentioned, because there is no competent evidence to support it and the evidence all points the other way, except in regard to one part of the finding which will be mentioned presently. The only evidence in the record to support the finding that Richards sold his own stock and not that of the corporation is his own statement that he did so. This was a mere conclusion of the witness, which may or may not have been correct—a conclusion which was at war with all the facts and circumstances in the case and manifestly incorrect. Hence, we do not regard that statement as competent evidence of the fact and so we do not feel that this court is precluded by the finding of the trial court from stating the fact which is disclosed by the evidence as to whose stock Harper purchased. He purchased stock which had not theretofore been issued by the corporation. There is no question about this fact. If those 100 shares ever did belong to Richards, his ownership thereof continued only

long enough for him to write his name upon the face of certificate No. 15, cancel that certificate, and issue certificate No. 16 in Harper's name. As a matter of fact and law Harper became a stockholder of the corporation on August 17th when he bought and paid for the shares. That sale it is admitted was intended by Richards and understood by Harper to be of shares belonging to the corporation and not to Richards. Richards learned upon consultation with his attorney that he had run counter to the Blue Sky Law in making that sale, and so, to extricate himself from possible difficulties, when Harper came to get the certificate, he went through the formalities which have been related to make it appear as a sale of his own shares instead of unissued shares of the corporation. What he said and did upon this occasion, for the avowed purpose of making a sale which he knew to be revocable at the election of the purchaser appear to be one which was absolutely binding, cannot be permitted by the court to conceal the true nature of the transaction. Furthermore, even if this court were to sustain the view taken by the trial court, that the sale was of stock which Richards owned in his individual right, there are two good and sufficient reasons why it must nevertheless be held to be within the statute and hence revocable at the election of the purchaser. The first is that in this view of the case, Richards was an underwriter of the shares; and the second is that the purchase money went directly into the treasury of the corporation and not to Richards. A sale in either situation is not excepted from the Blue Sky Law under subdivision (c) of section 4.

As to this being an isolated transaction, that part of the court's finding is supported by the evidence. The appellant points to the stock book, wherein it appears that certificates had been made out to Dr. Wm. L. Rich, George Allen, Richard Stringham, and Orlaf Farr, the latter being cancelled and says those entries are evidence of other sales made by Richards in transactions

similar to this one. But as there is no evidence to show by whom these sales were made, if the entries do in fact represent other sales, or in what manner of transactions the certificates were made out—and there is no evidence that Richards made any other sale of the stock of this corporation at any time—this part of said finding must be held to find support in the evidence. In all other respects, however, the finding is not only not supported by but is contrary to the evidence, and for this reason the judgment must be reversed and a new trial ordered.

That both the corporation and Richards are liable to plaintiff for the return of the money upon the facts herein disclosed, we entertain no doubt whatever; the corporation, because it took a direct part in the sale through Richards, its secretary, treasurer, and manager, ██ and also because it received the purchase money; and Richards, because of his participation in the sale. The question of Holbrook's liability, however, upon the facts disclosed by his record, is a debatable proposition. He can be held liable to plaintiff only because of some participation in the transaction which resulted in the sale. He cannot be held liable merely because he happened to be president of the corporation at the time, or because he signed the stock certificate which Richards delivered to the purchaser, or because he proposed and voted for the resolution passed by the board of directors at the meeting of December 13, 1928, under which Richards claimed to act, nor because of all these things. These facts, if not explained or if their effect be not destroyed by other evidence, might well be regarded by the trier of the facts as evidence proving that he did have some part in the transaction. The fact that he signed the stock certificate is alone strong evidence to that effect, and in the absence of other proof might be sufficient to support a finding against him. But there is other evidence in this case, which, if believed by the trial court, whose function it is to pass upon the credibility of the witnesses and to decide upon the weight to be given to their testi-

mony, shows beyond a peradventure that Holbrook took no part whatever in the transaction. His own testimony is that he was not present when any negotiations were had with Harper, that he took no part in the dealings with Harper, and that he did not know that Harper had become a stockholder until the day after the certificate had been issued, and that he signed the blank certificates to be used for purposes which are entirely legal. If these things are true, it cannot justly be concluded that he said or did anything whatever to promote this sale. In that case Richards exceeded the authority given him by the resolution of December 13, 1928, and made an unauthorized use of the certificate which Holbrook had signed.

The writer has not deemed it necessary to refer specifically to the assignments of error made in this case, as most of them relate in one way and another to the propositions which have been discussed. But there is one assignment which requires special mention. It is ∎ that the trial court failed to make any finding with respect to the allegations of paragraph 5 of the complaint which is denied by the answers and which plaintiff proved by uncontradicted evidence. This allegation is to the effect that plaintiff has elected to rescind and avoid the sale, and that he has indorsed and tenders back the stock to the defendants. In the view which the trial court took of the case, a failure to make a finding upon that issue could not of itself be held to be reversible error. It was a harmless error. But paragraph 5 contains allegations which are material to plaintiff's cause of action, and if judgment shall go for plaintiff upon a new trial, the court should make a finding thereon.

The judgment is reversed and the cause remanded to the district court of Salt Lake county, and that court is directed to grant plaintiff a new trial. If, upon a new trial, the judgment goes in favor of plaintiff and against defendant corporation, let it also run against the receiver. Appellant to recover costs.

∎

ELIAS HANSEN, C. J., FOLLAND and EPHRAIM HANSON, JJ., and NEPHI J. BATES, District Judge, concur.

MOFFAT and WOLFE, JJ., being disqualified, did not participate herein.