Lawanna W. STEENBLIK, individually and as trustee of the Lawanna W. Steenblik Family Trust Plan, Plaintiff and Appellee,

v.

Aaron LICHFIELD, Robert I. Rasmussen, Scott Craw, Zephor Planning Corporation dba Zephor Advisors, Inc., and Debra Rasmussen, Defendants and Appellant.

No. 930358.

Supreme Court of Utah.

Nov. 3, 1995.

L. Rich Humpherys and David C. Richards, Salt Lake City, for Steenblik.

Raymond N. Malouf, Logan, and R. Stephen Marshall, and Matthew M. Durham, Salt Lake City, for Lichfield.

STEWART, Associate Chief Justice:

Plaintiff Lawanna Steenblik sued Zephor Planning Corporation, a financial planning company through which she invested and lost her life savings, and four individuals connected with Zephor in various capacities. Appellant Aaron Lichfield was Zephor's vice-president and a director. He was also a financial planner. The other individual defendants were Robert I. Rasmussen, Zephor's president, a director, and a financial planner; his wife, Debra Rasmussen, the corporate secretary; and Scott Craw, a financial planner. Steenblik alleged violations of Utah's Uniform Securities Act, common law fraud, constructive fraud, and negligence. The jury found all defendants liable. Only Lichfield appeals.

## I. FACTS

Steenblik's association with defendants began on the day of her husband's death. Rasmussen, who held a local ecclesiastical position in addition to his positions at Zephor, came to her home to console her married son, Steven. Shortly after her husband's funeral, Steenblik, at the urging of her son, contacted Rasmussen for advice on investing her life savings and the insurance proceeds from her husband's death. Rasmussen reviewed all Steenblik's assets and in December 1987 developed a financial plan for her.

The first page of the plan stated, "Prepared By: Zephor Advisors Inc.," and the plan referred to "the Zephor Corporation" throughout. Unknown to Steenblik, Zephor's corporate authority had been suspended by the State of Utah in November 1987.

In January 1988, Rasmussen invited Steenblik to his office. Outside the building stood a sign identifying the business as Zephor. At the Zephor office, Rasmussen convinced her to invest a total of $45,000 in three companies, Equi–Healthcare, Equi–Development, and PLD Interior. At this point, Steenblik had not met Aaron Lichfield, nor is there any evidence that he knew of the above three investments made in January.

On April 27, 1988, Rasmussen encouraged Steenblik to lend money to Healthcare Professional Services (HPS) and Fairway, Inc. At the Zephor offices, Rasmussen introduced her to Aaron Lichfield, who, in addition to being vice-president of Zephor, was president of HPS and treasurer of Fairway. Rasmussen also had a personal interest in both HPS and Fairway. Steenblik was assured that HPS was a sound investment. However, no one disclosed the fact that HPS was a proposed start-up company that had no clients, operating history, assets, or stock. In fact, HPS was not even incorporated for another two months. To induce Steenblik to loan HPS $20,000, both Rasmussen and Lichfield signed a loan disclosure statement purporting to secure the debt with HPS preferred stock.

At the same meeting, Steenblik was also persuaded to lend $35,000 to Fairway, Inc. Fairway has never been a corporation. The only evidence of its existence as a company of any kind was a "corporate" bank account at First Interstate Bank of Utah. The signature card authorized Rasmussen, as Fairway's president, and Lichfield, as its treasurer, to withdraw money. The card was signed by both men. The loan was purportedly secured by nonexistent preferred stock.

On October 20, 1988, Steenblik again met both Rasmussen and Lichfield at the Zephor offices, where they induced her to lend another $8,000 to HPS. They signed a loan disclosure statement purporting to secure the loan with HPS stock. They also sold her

$3,000 of what they claimed was valuable stock in Rex Mining Company, an Arizona corporation that had been dissolved. Both Rasmussen and Lichfield were principals in Rex Mining. They told Steenblik that the value of the stock was backed by the company's mining equipment, when, in fact, the company owned no equipment. Lichfield signed the stock purchase agreement for Rex Mining.

Steenblik frequently called Rasmussen to check on her investments. When Rasmussen was out, Lichfield responded to her calls and continually assured her that her investments were safe and secure.

In November 1988, Rasmussen urged Steenblik to lend $12,000 to Green Construction Co. Rasmussen was a principal in Green Construction. Steenblik explained that her only remaining money was tied up in an individual retirement account and that she would suffer severe interest and tax penalties for early withdrawal. When Rasmussen assured her that all penalties would be covered if she made the loan, she agreed. Lichfield went to Steenblik's home to deliver a promissory note and collect the money. Although Lichfield was not a principal in Green Construction, Rasmussen had promised Lichfield a share in the company if Lichfield helped raise capital. When Lichfield arrived at plaintiff's home, Steenblik noted some irregularities in the promissory note and initially refused to go through with the loan. To obtain the money, Lichfield altered the instrument to plaintiff's satisfaction and collected the $12,000.

Lichfield's relationship with Rasmussen and Zephor continued until March 1989, when Lichfield resigned. In his letter of resignation, Lichfield complained that he could no longer manage to cover Zephor's and Rasmussen's numerous overdue and unsatisfied obligations.

After Steenblik's money was exhausted, the payments to her from the investments stopped. Unable to recover either the principal or the interest on her loans and investments, Steenblik sued. A jury found Lichfield liable for violation of the Utah Uniform Securities Act, for common law fraud, and for

negligence and awarded Steenblik $50,000 in damages against Lichfield.[1] The jury also found that the damages were the proximate result of Lichfield's "reckless or intentional" violations of the Act, which entitled plaintiff to treble damages, reasonable attorney fees, and costs pursuant to Utah Code Ann. § 61-1-22(2). In addition, the jury found Lichfield vicariously liable to Steenblik for 20% of Rasmussen's and Zephor's negligence for a total of $26,914.95 and awarded her an additional $50,000 in punitive damages against Lichfield. On this appeal, Lichfield argues that the jury verdict was against the clear weight of the evidence with respect to the claims (1) under the Act, including the finding that he recklessly or intentionally violated the Act, (2) for vicarious liability, and (3) for punitive damages. Lichfield also argues that the vicarious liability award against him wrongfully gave plaintiff a double recovery. In addition, he contends that the trial court's treble damage award under the Act was duplicative of the jury's punitive damage award. Finally, Lichfield argues that the court committed reversible error by allowing plaintiff's expert to testify about Lichfield's intent. We affirm the judgment except for the punitive damages award, which duplicates the treble damages awarded under the Act.

■■■■ To support a claim that the jury verdict is against the clear weight of the evidence, an appellant must marshal all of the evidence that supports the findings and demonstrate that when viewed in the light most favorable to the verdict, there is insufficient evidence to support it. *In re Estate of Beesley*, 883 P.2d 1343, 1349 (Utah 1994); *State v. Germonto*, 868 P.2d 50, 55 (Utah 1993); *Von Hake v. Thomas*, 705 P.2d 766, 769 (Utah 1985). All reasonable inferences must be drawn in favor of the verdict. *See Von Hake*, 705 P.2d at 769. If the evidence taken in the light most favorable to the verdict supports the verdict, we will affirm. *See Germonto*, 868 P.2d at 55.

## II. VIOLATION OF UTAH UNIFORM SECURITIES ACT

■■■ Lichfield attacks the verdict finding him liable for violating the Utah Uniform Securities Act. He argues (1) that Zephor's corporate authority was suspended in November 1987, prior to any of Steenblik's investments, (2) that his position with Zephor as a director and an officer was terminated when Zephor's corporate authority was suspended, and (3) that his personal involvement with Steenblik was so nominal that he had no legal liability. Lichfield contends that the evidence shows he had no knowledge that Rasmussen had induced Steenblik to invest through Zephor and that he assumed that plaintiff was Rasmussen's personal client, not Zephor's. He further claims that although he continued to be involved in various business dealings with Rasmussen after Zephor was suspended, he did so only on an informal, ad hoc basis, not as a principal of Zephor. In short, Lichfield argues that the evidence shows that his relationship was severed with Zephor and Rasmussen to such an extent that the jury could not reasonably find him liable under the Act.

Contrary to Lichfield's contentions, the evidence clearly shows that Lichfield's relationship with Zephor continued after the suspension of its corporate authority. In a letter to Rasmussen dated March 6, 1989, Lichfield complained that work for Zephor was consuming "at least 50%" of Lichfield's time and that "[a]s you may perceive, I am sick of making excuses for you [Rasmussen] and Zephor, so I QUIT." Lichfield complained about his involvement with other businesses including Rex Mining, Green Construction, and HPS, and he withdrew from them also. Significantly, he referred to these companies as "Zephor skeletons."

Lichfield also had personal involvement with Steenblik's investments that manifested a continuing relationship with Zephor. He met with Steenblik in April, October, and November 1988. During those three meetings, Steenblik was induced to invest $78,000 in HPS, Rex Mining, Green Construction, and Fairway. Lichfield signed or prepared documents purporting to secure all of these

---

**1.** The court ruled that Lichfield's liability for negligence was subsumed in the $50,000 award for violating the Act and for fraud.

investments except the $35,000 loan to Fairway. He had a personal interest in each of these entities. The evidence, rather than showing that Lichfield's relationship with Zephor ceased on the corporation's suspension, as he maintains, clearly allowed the jury to conclude that Lichfield had a connection with Zephor that existed long after Zephor's corporate authority was suspended.

Lichfield's participation in Zephor's operations after its corporate authority was suspended subjected him to liability for acts proscribed by the Utah Uniform Securities Act (the Act).[2] The Act applies to those who are able to exert control and influence over the policies and decisions of others. *See* Utah Code Ann. § 61–1–22; *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1441 (9th Cir.1987); *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 885 (3d Cir.1975). Section 61–1–22 imposes liability on any person who sells "a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made ... not misleading." Utah Code Ann. § 61–1–22.[3] It also imposes lia-

bility on "[e]very person who directly or indirectly controls a seller ..., every partner, officer, or director of such seller ..., [and] every person occupying a similar status or performing similar functions" unless he "sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." *Id.*

Thus, a partner, an officer, a director, a person of similar status or function, or a seller of securities is liable for violations committed by the entity unless that person proves the affirmative defense that he lacked knowledge of the unlawful acts. Thus, the scope of liability under the Utah Act is similar in a number of respects to § 77o of the Federal Securities Act of 1934.[4] However, Utah Code Ann. § 61–1–22(2) deviates from the federal act by expressly imposing liability on every partner, officer, director, or the like. The plaintiff need not demonstrate that such a person was able to control the transaction. If it is established that the defendant functioned in or occupied one of these posi-

**2.** Utah Code Ann. §§ 61–1–1 to –30 (1986) (amended 1992).

**3.** The full text of subsections (1) and (2) reads:

(1) Any person who:
(a) offers or sells a security in violation of [specifically enumerated sections], or
(b) offers, sells, or purchases a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person selling the security to or buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at 12% per year from the date of payment, costs, and reasonable attorney's fees
....
The court in a suit brought under Subsection (1)(b) may award an amount equal to three times the consideration paid for the security, together with interest, costs, and attorney's fees, less any amounts, all as specified in Subsection (1)(b) upon a showing that the violation was reckless or intentional.

(2) Every person who directly or indirectly controls a seller or buyer liable under Subsection (1), every partner, officer, or director of such a seller or buyer, every person occupying a similar status or performing similar functions, every employee of such a seller or buyer who materially aids in the sale or purchase, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller or purchaser, unless the nonseller or nonpurchaser who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.
Utah Code Ann. § 61–1–22.

**4.** The federal statute, 15 U.S.C. § 77o, states:

*Every person who,* by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, *controls any person liable* under section 77k or 77l of this title, *shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.*

tions, the defendant has the burden of proving that he did not know and, in the exercise of reasonable care, could not have known of the violation of the Act. *See Mitchell v. Beard,* 256 Ark. 926, 513 S.W.2d 905, 907 (1974) (construing similar statute); *Arnold v. Dirrim,* 398 N.E.2d 426, 433–34 (Ind.Ct.App. 1979) (same); *Foelker v. Kwake,* 279 Or. 379, 568 P.2d 1369, 1373 (1977) (en banc); *McGaha v. Mosley,* 283 S.C. 268, 322 S.E.2d 461, 465 (Ct.App.1984). Furthermore, Utah Code Ann. § 61–1–22(1)(b) provides that "upon a showing that the violation was reckless or intentional," the court may award treble damages, interest, costs, and attorney fees.

■ Lichfield argues that the suspension of Zephor's corporate authority terminated his personal liability as a director and an officer of Zephor. Suspension is a temporary restriction on the corporation's authority and functions [5] that renders the corporation powerless or unable to continue its normal operations. *See Mackay & Knobel Enter., Inc. v. Teton Van Gas, Inc.,* 23 Utah 2d 200, 203, 460 P.2d 828, 829 (1969); *Micciche v. Billings,* 727 P.2d 367, 370 (Colo.1986); *Kupski v. Bal Invest. Co.,* 35 Mich.App. 680, 192 N.W.2d 519, 522 (1971); *see also* Colo. Rev.Stat. § 7–10–109(2) (repealed 1994) (providing that "[a]ny domestic corporation which is suspended ... shall be inoperative and no longer competent to transact business in this state"). Under the former Business Corporation Act, the corporation could cure the default and regain its powers by correcting any delinquencies and paying a reinstatement fee. Utah Code Ann. § 16–10–88.2 (repealed 1987).[6] A temporary revocation of authority is intended to encourage a delinquent corporation to rectify its delinquency. *Bank of America Nat'l Trust & Savings Assoc. v. Morse,* 265 Or. 72, 508 P.2d 194, 196 (1973). Thus, the suspension revoked Zephor's authority and gave the corporation one year to rectify its delinquency or be dissolved.

■ Zephor's officers' liability for its operations during suspension, however, was not terminated. The liability for operating a corporation without authority is set forth in Utah Code Ann. § 16–10–139, which provides:

> All persons who assume to act as a corporation without authority so to do shall be jointly and severally liable for all debts and liabilities incurred or arising as a result thereof.

A person who purports to act for and on behalf of a corporation that has no corporate authority is personally liable. *See Gillham Advertising Agency, Inc. v. Ipson,* 567 P.2d 163, 165 (Utah 1977); *see also Loveridge v. Dreagoux,* 678 F.2d 870, 878 (10th Cir.1982) (interpreting Utah law). Section 16–10–139 is a codification of general corporation law that holds promoters personally liable as partners for preincorporation debts and obligations. *See Malisewski v. Singer,* 123 Ariz. 195, 598 P.2d 1014, 1015 (Ct.App.1979); *Gazette Pub. Co. v. Brady,* 204 Ark. 396, 162 S.W.2d 494, 496 (1942); *Holzer Sheet Metal Works v. Reynolds & Marshall,* 43 So.2d 169 (La.Ct.App.1949).

There is, however, a split of authority as to whether personal liability as provided by the general rule embodied in § 16–10–139 applies when a corporation's authority is suspended or whether its application is limited to preincorporation activities. A minority of jurisdictions hold that individuals are not liable for corporate obligations incurred while the corporation is suspended. *Micciche v. Billings,* 727 P.2d 367, 371 (Colo.1986), for example, held that corporate officers were not personally liable, under a statute worded identically to § 16–10–139, for obligations they incurred during suspension. The Colorado Supreme Court gave three reasons for its holding. First, it stated that a purpose of the statute was to eliminate *de facto* corporations. Second, the absence of express lan-

---

**5.** "Suspend" commonly means "to debar, or cause to withdraw temporarily, from any privilege, office, or function" *Webster's New Int'l Dictionary* (2d ed. 1949). Black's definition of suspend is "to discontinue temporarily, but with an expectation or purpose of resumption." *Black's Law Dictionary* 1446 (6th ed. 1990).

**6.** Chapter 10 of Title 16 was repealed in 1992 and was replaced by the Revised Business Corporation Act. *See* 1992 Utah Laws ch. 277, § 248 (effective July 1, 1992). Similar provisions are now located at Utah Code Ann. §§ 16–10a–1421 to –1423 (Supp.1995).

guage imposing personal liability indicated that no liability was intended because prior statutes had expressly imposed personal liability on officers and directors for corporate debts incurred during suspension. Finally, the court stated that Colorado case law held that upon reinstatement there is no personal liability for corporate debts incurred during suspension. The Colorado court reasoned that it would be anomalous to impose personal liability if reinstatement is not sought and at the same time eliminate that liability if reinstatement is obtained. Such a rule would make personal liability contingent on corporate actions over which the individual has no control. In Colorado, therefore, persons operating a suspended corporation are not personally liable for obligations arising from those operations.

A contrary rule is followed in a majority of jurisdictions. For example, a corporate officer was held personally liable, under a Mississippi statute identical to § 16–10–139, for continuing business while the corporation was suspended. *Carolina Transformer Co. v. Anderson,* 341 So.2d 1327, 1329–30 (Miss. 1977). Likewise, in *T–K Distributors, Inc. v. Soldevere,* 146 Ariz. 150, 152, 704 P.2d 280, 282 (Ct.App.1985), principal stockholders were held personally liable for their acts performed after revocation of corporate authority but before reinstatement. *See also Anderson v. Hillsborough Sheet Metal, Inc.,* 513 So.2d 1359 (Fla.Dist.Ct.App.1987); *Estate of Plepel v. Industrial Metals, Inc.,* 115 Ill.App.3d 803, 71 Ill.Dec. 365, 450 N.E.2d 1244 (1983); *Kessler Distributing Co. v. Neill,* 317 N.W.2d 519 (Iowa Ct.App.1982). *T–K Distributors* acknowledged that its statute, identical to § 16–10–139, was intended to abolish the doctrine of *de facto* corporations but further noted that its broad language applied to all who assume to act as a corporation without authority and "sets forth no exception for individual liability which might arise during the period of revocation and reinstatement of a corporation." 704 P.2d at 282; *see also Carolina Transformer,* 341 So.2d at 1330; *Kessler Distributing,* 317 N.W.2d at 522. The statutory history in Arizona also indicated that individuals who continued a corporation's business after its authority had been revoked were personally

liable. *See T–K Distributors,* 704 P.2d at 282. Also following the majority rule, the Iowa Court of Appeals reasoned:

> Reinstatement of the corporate charter should not be viewed as retroactively restoring the privilege of limited liability with respect to transactions which took place during the period of time when the corporate charter was revoked.

*Kessler Distributing,* 317 N.W.2d at 522; *T–K Distributors,* 704 P.2d at 283. Jurisdictions that do not automatically eliminate personal liability upon reinstatement do not create an anomaly by holding persons liable for assuming to act as a corporation when the corporation's authority has been suspended.

In our view, the reasoning that supports the majority rule is persuasive. By its terms, § 16–10–139 applies to all persons who act as a corporation without authority. *See Murphy v. Crosland,* 886 P.2d 74, 80 (Utah Ct.App.1994). It therefore abolishes the *de facto* corporation doctrine, but nothing in the statute's language suggests that it is limited to that purpose. *See* cases cited in *American Vending Servs. Inc. v. Morse,* 881 P.2d 917 (Utah Ct.App.1994). Further, nothing in Utah's statutory history suggests that § 16–10–139 is limited to preincorporation activities. Here, Zephor's authority not only was suspended, but was never reinstated. As to corporations that have been suspended and not reinstated, we hold that officers and directors who continue the business of a suspended corporation are personally liable for all debts and liabilities arising from those operations that are a continuation of the types of activities the corporation performed. Under such circumstances, the relationship of persons who continue the operations of a suspended corporation is like the relationship of preincorporation promoters, which is essentially that of partners. Thus, persons who act as if pursuant to valid corporate authority, after that authority has been suspended, are personally responsible for liabilities arising from the continued operations. *First Nat'l Bank of Boston v. Silberstein,* 398 S.W.2d 914, 915–16 (Tex.1966). They are jointly and severally liable with others who know the corporation's authority is no longer effective but continue its operations. *Mobil*

*Oil Corp. v. Thoss,* 385 So.2d 726, 726–27 (Fla.Dist.Ct.App.1980) (construing a similarly worded statute); *Steve's Equip. Service, Inc. v. Riebrandt,* 121 Ill.App.3d 66, 76 Ill.Dec. 612, 615, 459 N.E.2d 21, 24 (1984) (same); *Kessler Dist. Co. v. Neill,* 317 N.W.2d 519, 522 (Iowa Ct.App.1982) (same).

As stated, the Utah Securities Act provides that "every partner" of a securities seller and "every person occupying a similar status or performing similar functions" is liable unless he proves that he neither knew nor in the exercise of reasonable care could have known of the violations. Utah Code Ann. § 61–1–22(2). Lichfield argues that the evidence shows he did not know and could not have known that the securities sold to Steenblik were sold in violation of the Act. His argument does not comport with the facts and the inferences the jury was entitled to draw. Lichfield was present when plaintiff invested $20,000 in HPS before it was incorporated. He listened as Rasmussen assured Steenblik that HPS was a sound investment without disclosing the material facts that HPS was a start-up company with no operating history and no clients. In addition, he signed the loan disclosure statement which falsely purported to show the loan was secured with HPS preferred stock. It is inconceivable that he did not know of this violation. Lichfield's knowledge of Steenblik's subsequent investments in HPS, Rex Mining, and Green Construction is equally clear. He was present at each meeting; he had a personal interest in each investment; and similar untrue statements or material omissions induced plaintiff's investments.

Lichfield was a director or an officer as those terms are used in § 61–1–22, and he participated in meetings where false or misleading statements were made or material facts were omitted in the sale of a security. Under such circumstances, such a person is liable if he does not exercise his power or influence to prevent the illegal conduct. *San Francisco–Oklahoma Petroleum Exploration Corp. v. Carstan Oil Co.,* 765 F.2d 962, 964 (10th Cir.1985) (per curiam). Actual knowledge of the violations is sufficient for the jury to find a defendant liable. *See id.* at 964; *Wool v. Tandem Computers, Inc.,* 818 F.2d

1433, 1442 (9th Cir.1987); *McGaha v. Mosley,* 283 S.C. 268, 322 S.E.2d 461, 465 (Ct. App.1984).

■ Lichfield asserts that he neither knew of nor participated in Steenblik's $35,000 investment in Fairway. Even accepting his claim as true, Lichfield is still liable. The lack-of-knowledge defense of § 61–1–22(2) "refers not to a particular transaction, but to the existence of the basic facts relating to the course of business of the corporation. The director [or officer] need not have been involved in the particular transaction." *San Francisco–Oklahoma Petroleum,* 765 F.2d at 965. Ignorance of a particular transaction is not exculpatory because officers and directors are liable if, in the exercise of reasonable care, they could have known. *See Monsen v. Consolidated Dressed Beef Co.,* 579 F.2d 793, 804 (3d Cir.1978); *Moerman v. Zipco, Inc.,* 302 F.Supp. 439, 450 (E.D.N.Y. 1969). As discussed, starting in April 1988, Lichfield clearly knew that Steenblik was being fraudulently enticed into making investments. He did nothing to warn her or prevent her savings from being consumed. To the contrary, Lichfield helped defraud her. He cannot escape liability by claiming that one of the fraudulent transactions was completed without his knowledge.

Lichfield also argues that Utah law requires more than nominal participation to establish liability under the Act. He relies on *Willis v. Spring Canyon Copper Co.,* 4 Utah 2d 211, 291 P.2d 878 (1956), and *Harper v. Tri–State Motors, Inc.,* 90 Utah 212, 58 P.2d 18 (1936), for support. Those cases construed the forerunner of the Utah Uniform Securities Act, which expressly limited liability to defendants who "participated" or "aided" in some way. *See Willis,* 4 Utah 2d at 212–13, 291 P.2d at 879; *Harper,* 90 Utah at 214, 58 P.2d at 19; *see also* Utah Code Ann. § 61–1–25 (1953) (repealed 1963). As written, § 61–1–22 imposes liability on a partner, an officer, or a director without requiring any direct participation in a particular transaction. In this regard, it is significant that the Act deals differently with employees of sellers than with officers and directors. Liability is imposed on an employee of a seller only if the employee "materially

aids" in a sale that violates subsection (1) of § 61–1–22. Therefore, as a director, Lichfield's liability was not dependent on his personal participation in the transaction.

■ Lichfield also contests the finding that he recklessly or intentionally violated the Act, which conduct gave rise to treble damages. *See* Utah Code Ann. § 61–1–22(1)(b). The evidence supports the jury verdict. Lichfield was personally involved with Steenblik's investments: He signed loan disclosure and stock purchase agreements, he continuously reassured her that her money was secure, and he funded his personal business ventures by repeatedly returning to Steenblik for funds. Lichfield's conduct was intentional and reckless.

### III. VICARIOUS LIABILITY

Lichfield next challenges the jury verdict holding him vicariously liable for 20% of the negligence of Zephor and Rasmussen in the amount of $26,914.95. The jury was instructed regarding various bases of vicarious liability. Lichfield argues that even considering all the evidence in favor of the verdict, the evidence was legally insufficient to support the verdict on any ground. We disagree.

As discussed above, Utah Code Ann. § 16–10–139 imposes liability on all persons who purport to act for a corporation whose authority has been suspended, just as liability is imposed on preincorporation promoters. Prior to incorporation, promoters are often treated as if they have entered into a partnership and are subject to liability as partners. *Malisewski v. Singer,* 123 Ariz. 195, 598 P.2d 1014, 1015 (Ct.App.1979); *Gazette Pub. Co. v. Brady,* 204 Ark. 396, 162 S.W.2d 494, 496 (1942). Because partners are jointly and severally liable, each partner can be held liable for the wrongful acts of the other partners that injure a third person. Utah Code Ann. § 48–1–12; *see McCune & McCune v. Mountain Bell Tel.,* 758 P.2d 914, 917 (Utah 1988); *Palle v. Industrial Comm'n,* 79 Utah 47, 55, 7 P.2d 284, 288 (1932).

■ That principle of partnership liability applies to Lichfield for his continued operations with Rasmussen after Zephor lost its corporate authority. In fact, Lichfield and Rasmussen often acted jointly in Zephor's unauthorized business with Steenblik. Both were present when Steenblik visited the Zephor office and made the two HPS loans, the Fairway loan, and the Rex Mining stock purchase. Lichfield and Rasmussen both signed the documents purporting to secure the HPS loans and the Green Construction loan. Furthermore, in his March 1989 resignation letter, Lichfield spoke of continuing Zephor's operations with Rasmussen, including Lichfield's ongoing contributions of time and money to the business. In that letter, Lichfield described his relationship with Rasmussen as a "general partner." Lichfield's and Rasmussen's relationship and conduct after Zephor's authority was suspended was much the same as co-promoters prior to corporate authority being granted, and under § 16–10–139 they are subject to the same liability. The jury's finding that Lichfield was liable for 20% of Rasmussen's and Zephor's misconduct was not unreasonable.

Lichfield also argues that the jury miscomputed his damages and that vicarious liability for 20% of Rasmussen's and Zephor's negligence is less than $26,914.95. We have reviewed the computation of damages for vicarious liability and find no error.

■ In addition, Lichfield argues that imposing vicarious liability on him grants plaintiff a double recovery. Lichfield misconstrues the nature of joint and several liability. The imposition of joint and several liability means that Steenblik may recover from Lichfield and/or Rasmussen and/or Zephor to satisfy the verdict. If Rasmussen or Zephor pays the judgment, Lichfield's vicarious liability is satisfied. If Lichfield pays the full amount of $26,914.95, Lichfield would have an indemnity or contribution claim against Rasmussen and Zephor for their shares of the judgment. *See, e.g., Perry v. Pioneer Wholesale Supply Co.,* 681 P.2d 214, 218 (Utah 1984); *see also Hanover Ltd. v. Cessna Aircraft Co.,* 758 P.2d 443, 445 (Utah Ct.App. 1988). Steenblik may recover her damages only once.

## IV. DUPLICATIVE AWARDS

■ The jury found Lichfield jointly and severally liable with Rasmussen and Zephor in the amount of $50,000 for "recklessly or intentionally" violating the Act. Pursuant to Utah Code Ann. § 61–1–22(1)(b), the court awarded "an amount equal to three times the consideration paid for the securit[ies] ... upon a showing that the violation was reckless or intentional." *Id.* The jury also awarded $50,000 in punitive damages. Lichfield argues that the punitive and treble damages awards are improperly duplicative because both are based on the same conduct. We agree.

The trial court characterized the treble damages as a statutory penalty "assessed as a result of the reckless and intentional violations of the Act," and said that "punitive damages are punishment for defendant's malicious actions." Lichfield's conduct is easily classified as malicious, reckless, and intentional. Nevertheless, in *Alta Industries Ltd. v. Hurst,* 846 P.2d 1282, 1292 (Utah 1993), we held that a statutory penalty and an award of punitive damages were duplicative because they were "based on the same set of facts." As a consequence, we vacated and set aside one of the awards. In this case, Lichfield's "reckless and intentional" acts in violation of the Act were the same "malicious" acts for which the jury awarded punitive damages. However wrongful his actions, Lichfield followed only one course of conduct. That this conduct persisted over time does not create two sets of facts for which he should be punished twice. The treble damages awarded under the Act are punitive in nature. One of the awards must be vacated.

■ As to which award should be vacated, the prevailing party must be allowed to choose between the duplicative awards. *Hale v. Basin Motor Co.,* 110 N.M. 314, 795 P.2d 1006, 1012 (1990); *see Bill Terry's, Inc. v. Atlantic Motor Sales, Inc.,* 409 So.2d 507, 509 (Fla.Dist.Ct.App.1982). Generally, it can be assumed that the prevailing party will

elect the greater punitive award. In this case, Steenblik has elected to receive the $150,000 treble damages award under the Act. Thus, the jury verdict for $50,000 in punitive damages is vacated. The award of treble damages under the Act is affirmed.[7]

■ One other damage issue must be addressed. The trial court awarded more damages than the Act authorized. The jury found that Rasmussen and Zephor were liable for all $150,000 of Steenblik's losses. It also found that Lichfield was jointly and severally liable for $50,000 of the $150,000. Pursuant to the Act the trial court trebled the award against Rasmussen and Zephor to $450,000 and against Lichfield to $150,000. As to Lichfield, the trial court ruled that "because $100,000 of the $150,000 in treble damages is a statutory penalty assessed as a result of the reckless and intentional violations of the Act ... these damages are not [subject to] joint liability with any other defendant." Thus, $100,000 of Lichfield's liability under the Act is additional to the $450,000 assessed under the Act against Rasmussen and Zephor. This awards Steenblik more than the Act authorizes. However, if the entire $150,000 of Lichfield's liability were joint and several with Rasmussen and Zephor, then Steenblik could be compensated for a total of only $450,000. Thus, Lichfield's liability must be joint and several with Rasmussen and Zephor.

## V. EXPERT TESTIMONY

■ Lichfield's last argument is that the trial court committed reversible error by allowing plaintiff's expert to testify about Lichfield's intent. However, Lichfield did not object to the testimony at trial. "[T]o preserve a contention of error in the admission of evidence for appeal, a defendant must raise a timely objection in the trial court." *State v. Schreuder,* 726 P.2d 1215, 1222 (Utah 1986); Utah R.Evid. 103(a). Otherwise, the error is waived unless it constituted plain error. Utah R.Evid. 103(d); *State v. Elm,*

---

7. The Utah Act states that the court "may award an amount equal to three times the consideration paid for the security." Utah Code Ann. § 61–1–22(1)(b). An award amounting to more than three times the consideration paid clearly exceeds the amount authorized by the Act. The jury found that Steenblik lost $150,000 from violations of the Act. Therefore, she stands to receive no more than $450,000 under the Act.

882

808 P.2d 1097, 1100 (Utah 1991); *State v. Eldredge,* 773 P.2d 29, 35 (Utah 1989). None of the errors cited were so obvious that their admission was plain error. *Elm,* 808 P.2d at 1100; *Eldredge,* 773 P.2d at 35.

The judgment is affirmed on all grounds except that the $50,000 punitive damages award is vacated.

ZIMMERMAN, C.J., and HOWE, DURHAM, and RUSSON, JJ., concur.