Steven L. EVANS, Plaintiff and Appellee,

v.

STATE of Utah, Defendant
and Appellant.

Joseph L. EVANS, Evans Broadcasting,
Inc., and Country Gold Broadcasting
Inc., Plaintiffs and Appellees,

v.

STATE of Utah, Defendant
and Appellant.

No. 970146.

Supreme Court of Utah.

June 23, 1998.

George A. Hunt, Salt Lake City, for Steven Evans.

Gayle F. McKeachnie, Clark A. McClellan, Vernal, for Joseph Evans, Evans Broadcasting, and Country Gold Broadcasting.

Jan Graham, Att'y Gen., R. Wayne Klein, Asst. Att'y Gen., Salt Lake City, for the State.

RUSSON, Justice:

## INTRODUCTION

The State appeals a district court order granting petitions to quash antitrust civil investigative demands the State issued to Joseph Evans, Steven Evans, Evans Broadcasting, Inc., and Country Gold Broadcasting, Inc. The State sought information relating to possible antitrust violations between radio stations in the Uintah Basin; however, the district court ruled that the State had not met its burden under Utah Code Ann. § 76–10–917(7)(b)(ii) to maintain an investigation and that the radio stations were exempt from investigation under section 76–10–915(1)(a). We reverse and remand.

## BACKGROUND

In 1996, a merchant in the Uintah Basin contacted the Antitrust Division of the Utah

Attorney General's office ("Division") and complained of possible collusion in the pricing of radio station advertising in the Vernal and Roosevelt radio markets. The merchant had compared advertising rates in the area and informed the Division that the rates charged by the radio stations in Vernal were identical to those in Roosevelt. The merchant also reported that he had been offered a discount on advertising rates if he would advertise on radio stations in both cities.

The Division conducted a preliminary investigation into the merchant's allegations and found that there are only four radio stations in the Uintah Basin—two stations are located in Roosevelt, and two are located in Vernal. The two radio stations in Roosevelt, KNEU and KFIX, are both owned by Evans Broadcasting, Inc., and Country Gold Broadcasting, Inc. Joseph Evans, the owner of these corporations, manages KNEU and KFIX. The radio stations in Vernal, KVEL and KLCY, are owned by Ashley Communications, Inc., which is owned by James Davis.[1] Joseph Evans' son, Steven Evans, is the general manager of KVEL and KLCY. The real estate and buildings where the Vernal radio stations are located are owned by DEE Properties, L.L.C., a limited liability corporation with six members: James Davis, Steven Evans, Joseph Evans, and their wives.

The four radio stations operate under licenses granted by the Federal Communications Commission (FCC) as required by the FCC for lawful operation. The FCC does not actively regulate prices charged by radio stations for advertising.

In December 1996, pursuant to Utah Code Ann. § 76–10–917, the Division issued civil investigative demands (CIDs) to Steven Evans, Joseph Evans, Evans Broadcasting, Inc., and Country Gold Broadcasting, Inc. The CIDs requested testimony and documents related to the advertising prices and collusion among the four radio stations.

Plaintiffs filed separate petitions to quash the CIDs, and the district court consolidated the petitions at a hearing on February 14, 1997. In granting the petitions, the court

concluded that (1) the State failed to meet its burden to show that it had "reasonable cause" to believe a violation had occurred under Utah Code Ann. § 76–10–917(7)(b)(ii), and (2) the radio stations were exempt from investigation under Utah Code Ann. § 76–10–915(1)(a) because they are "subject to regulation" by the FCC.

On appeal, the State raises the following two arguments: first, the court incorrectly applied a "probable cause" standard and therefore incorrectly ruled that the State had not met its statutory burden, and second, the court erred in finding that plaintiffs' activities are exempt from the Act.

## STANDARD OF REVIEW

■ We are asked to review whether the district court erred in ruling that the State had not met its statutory burden of showing "reasonable cause" to believe a civil antitrust violation had occurred. This is a question of first impression. However, we believe the standard of review is similar to the standard we apply in the area of criminal law regarding similar questions.

We have stated that " 'a trial court determination of whether a specific set of facts gives rise to reasonable suspicion is a determination of law and is reviewable nondeferentially for correctness.' " *State v. Hodson*, 907 P.2d 1155, 1157 (Utah 1995) (quoting *State v. Pena*, 869 P.2d 932, 939 (Utah 1994)). Nevertheless, because the legal standard for "reasonable suspicion" and "probable cause" is highly fact dependent, we have afforded a "measure of discretion" to such determinations. *Id.; State v. Poole*, 871 P.2d 531, 533 (Utah 1994). Therefore, we will review the district court's decision for correctness while affording a "measure of discretion" to that court in our application of the correctness standard to a given set of facts. *Id.*

■ However, the court's ruling that plaintiffs' activities are exempt from the Act is a matter of statutory interpretation, which involves a question of law. We will therefore review that ruling for correctness without deference. *S.H. v. Bistryski*, 923 P.2d 1376, 1379 (Utah 1996).

---

1. Ashley Communications and James Davis were not plaintiffs in the action below.

## ANALYSIS

### I. THE "REASONABLE CAUSE" STANDARD UNDER UTAH CODE ANN. § 76-10-917

The first issue we must decide is whether the district court correctly determined that the State had not met its burden of showing that it was justified in issuing the CIDs. The Utah Antitrust Act authorizes the attorney general to issue CIDs "[w]hen the attorney general has *reasonable cause* to believe that any person may be in possession, custody or control of any information relevant to a civil antitrust investigation." Utah Code Ann. § 76-10-917(1) (1995) (emphasis added). If the CID recipient fails to comply with the demand, the attorney general may file a petition for an order compelling compliance with the demand. *Id.* § 76-10-917(7)(a). Thereafter, the court must hold a hearing at which the attorney general has the burden of establishing "that the demand is proper, that there is *reasonable cause to believe that there has been a violation of this act,* and that the information sought or document or object demanded is relevant to the violation." *Id.* § 76-10-917(7)(b)(ii) (emphasis added).

Initially, the State asserts that the court incorrectly relied on a "probable cause" standard rather than on the significantly lower "reasonable cause" standard and therefore erred in ruling that the State had not met its statutory burden. To support its claim, the State relies on the record from the hearing, in which the court made repeated references to probable cause.

For example, during the hearing the judge asked whether it is true that "you have got to show, before you can issue a civil investigative demand, some *probable cause* to believe, that there is a violation, and that *probable cause* rises to the level of, let's say, just short of the evidence that would be required in a preliminary hearing." (Emphasis added.) Thereafter, at counsel's request, the court explained its ruling from the bench, stating, "[I]n relation to the issue of *probable cause,* I

don't find adequate information in the affidavit to support the notion that there was an agreement [between plaintiffs]." (Emphasis added.)

Although the court referred to probable cause several times during the hearing, in its written order the district court concluded, "The State failed to meet its burden to show that *reasonable cause* existed to warrant investigation of the activities described in the Civil Investigative Demands." (Emphasis added.) The State's ultimate concern is that while the court used "reasonable cause" in its written order, what it really meant was "probable cause."

Regardless of the language used during the hearing, the language in the court's final written order controls, and we will presume the order is correct unless affirmatively shown otherwise. *See Pena,* 869 P.2d at 935-36. However, the State does not assert, nor does the record indicate, that the State objected in a timely manner to the written order's use of "reasonable cause." [2] Rule 4-504(2) of the Utah Rules of Judicial Administration provides: "Copies of the proposed findings, judgments, and orders shall be served upon opposing counsel before being presented to the court for signature unless the court otherwise orders. Notice of objections shall be submitted to the court and counsel within five days after service." Utah Code of Judicial Admin. R4-504(2). Whether the district court erroneously referred to "probable cause" during the hearing is immaterial, because the State accepted the court's use of "reasonable cause" in the written order. Having failed to properly object, the State waived its right to challenge the order in this regard on appeal. We therefore hold that the trial court used the correct "reasonable cause" standard in its final written order.

While the district court used the correct statutory standard, we must still determine whether it correctly applied that standard to the facts in this case. This court has

---

**2.** While the State filed an objection to the proposed order, prepared by Steven Evans' counsel, it apparently objected only to the order's conclusion that plaintiffs' conduct was exempt. The State proposed an order without a finding on the exemption issue; however, the court signed the order and denied the State's objection.

never expressly defined "reasonable cause" as that term is used in the Act. According to the Act, "[t]he legislature intends that the courts, in construing this act, will be guided by interpretation given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes." Utah Code Ann. § 76–10–926. Therefore, we will look to federal and state courts for guidance as to the proper definition of "reasonable cause" in the context of antitrust law.

Federal antitrust law authorizes the issuance of CIDs "[w]henever the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice, has *reason to believe* that any person may be in possession, custody, or control of any documentary material, or may have any information, relevant to a civil antitrust investigation." 15 U.S.C. § 1312(a) (emphasis added). The parties did not cite, nor has our research uncovered, any federal cases that explicitly define the "reason to believe" standard. However, the federal courts' application of that standard indicates that the burden is easily satisfied. *See, e.g., Associated Container Transp. (Australia) Ltd. v. United States,* 705 F.2d 53, 58 (2d Cir.1983); *Finnell v. United States Dep't of Justice,* 535 F.Supp. 410, 415 (D.Kan.1982); *Blue Cross & Blue Shield v. Bingaman,* No. 1:94–CV2297, 1996 WL 677094, at *5, 1996 U.S. Dist. LEXIS 17091, at *14 (N.D. Ohio June 24, 1996) (upholding CID because it was reasonably related to legitimate investigation). Specifically, in *Blue Cross* the court stated, "A court should not set aside a CID unless it would quash the same request contained in a subpoena or subpoena duces tecum issued by a district court in aid of a grand jury investigation." *Blue Cross,* 1996 WL 677094, at *1, 1996 U.S. Dist. LEXIS

17091, at *3. Moreover, federal courts have stated that the reason to believe standard is satisfied where the CID was issued merely for the purpose of ascertaining whether the antitrust laws have been violated. *See Associated Container Transp.,* 705 F.2d at 58.

The notion that the reason to believe standard is a relatively low burden is further supported by the purposes behind the federal antitrust investigative provisions. One federal court has noted that such purposes are twofold: "(1) to enable the Attorney General to determine whether there has been a violation of the antitrust laws, and if so (2) to enable the Attorney General to allege properly the violations in a civil complaint." *Petition of Gold Bond Stamp Co.,* 221 F.Supp. 391, 397 (D.Minn.1963). Thus, CIDs simply facilitate the attorney general's investigations into antitrust violations and enable the attorney general to gather enough information to initiate a proper civil action. Likewise, the CIDs issued by the Utah Attorney General assist that agency in gathering enough information to make a proper determination as to whether a civil antitrust action should be initiated.

Turning to state courts' treatment of "reasonable cause," the State has cited to ten states that have antitrust laws requiring reasonable cause to issue CIDs.[3] While the State asserts that only five of those states' appellate courts have examined their statutes regarding the issuance of CIDs, only one state, Arizona, has given a meaningful review of the reasonable cause standard that can be applied to the case at bar.[4]

In *Babbitt v. Herndon,* 119 Ariz. 454, 581 P.2d 688 (1978), the Arizona attorney general initiated an investigation to determine whether the sales and advertising practices of a business violated the Arizona Consumer Fraud Act.[5] In response to the investigation,

**3.** *See* Ariz.Rev.Stat. Ann. § 44–1406 (1994); Iowa Code § 553.9 (1997); Mass. Gen. L. ch. 93, § 8 (1994); Mich. Comp. Laws § 28.70(6) (1990); Nev.Rev.Stat. § 598A.100 (1994); N.M. Stat. Ann. § 57–1–5 (1995); N.D. Cent.Code § 51–08–1.06 (1989); Ohio Rev.Code § 1331.16 (Supp.1996); R.I. Gen. Laws § 6–36–9 (1992); S.D. Codified Laws § 37–1–11.1 (1994).

**4.** The state appellate court decisions cited by the State are *Babbitt v. Herndon,* 119 Ariz. 454, 581

P.2d 688 (1978), *Wilson Corp. v. State,* 121 N.M. 677, 916 P.2d 1344 (N.M.Ct.App.1996), *Ida County Courier & Reminder v. Attorney General,* 316 N.W.2d 846 (Iowa 1982), *Borden, Inc. v. State,* 65 Ohio App.2d 1, 413 N.E.2d 848 (1979), and *Office of Attorney General v. M.J.D.,* 396 N.W.2d 757 (S.D.1986).

**5.** The Arizona Consumer Fraud Act, Ariz.Rev. Stat. §§ 44–1521 to –1534, and the Arizona Uniform State Antitrust Act, Ariz.Rev.Stat. §§ 44–

the business argued that there was no reasonable cause to believe there had been a violation of the Act. In addressing the merits of the arguments, the court first discussed the policy considerations underlying a civil investigation by the state. In doing so, it reasoned that the reasonable cause standard operated to (1) impose an additional substantive limitation on the attorney general's power to engage in precomplaint discovery and (2) prevent abuses or excesses which might result from unlimited powers of investigation. *Babbitt*, 581 P.2d at 690. The court then established the following test to determine whether the attorney general had shown reasonable cause:

> [T]he decision is relatively uncomplicated, as it does not involve extensive weighing or testing of evidence or any resolution of conflicts on the evidence. *The question at hearing is not whether the state's information is true or uncontradicted, but whether, assuming its accuracy, the state has in its possession sufficient information to satisfy a judge that it is reasonable to believe that there has been a violation of the act.*

*Id.* at 692 (emphasis added). We agree with the sound reasoning and the sensible definition of "reasonable cause" elucidated by the *Babbitt* court, which provide a workable framework in addressing challenges to CIDs issued under Utah's Antitrust Act.

Before turning to our application, we address the parties' arguments relating to the burden of proof required by the reasonable cause standard in relation to other standards. As the State asserts, "proof beyond a reasonable doubt" is the highest standard, while "reasonable cause" is the lowest, and the "clear and convincing," "preponderance of the evidence," and "probable cause" standards are somewhere in between. Plaintiffs agree that reasonable cause is lower than probable cause for preliminary hearings, which requires only " 'a quantum of evidence sufficient to warrant submission of the case to the trier of fact.' " *State v. Pledger*, 896 P.2d 1226, 1229 (Utah 1995) (quoting *State v. Anderson*, 612 P.2d 778, 783 (Utah 1980)).[6] As one can reasonably infer from *Pledger*, the evidence required for binding a defendant over to district court is relatively low because the assumption is that the prosecution's case will only get stronger as the investigation continues. *Id.* Hence, the evidence fails to meet the probable cause standard only when it is "[w]holly lacking and incapable of reasonable inference to prove some issue which supports the [prosecution's] claim." *Id.*

■ Reason dictates that an investigation based on the reasonable cause standard requires less evidence than the "quantum of evidence sufficient to warrant submission of the case to the trier of fact" required by the probable cause standard. Moreover, the reasonable cause standard would seem to allow an investigation to go forward on the assumption that the attorney general's case will only get stronger as the investigation proceeds.

Plaintiffs argue that the reasonable cause standard requires some showing of objective

1401 to –1416, are both codified under title 44, chapter 10 of the Arizona Revised Statutes, which governs competition and competitive practices in trade and commerce. The provisions of each Act governing the Arizona attorney general's power to investigate violations thereunder are substantially similar. *Compare id.* § 44–1406(B) ("If the court finds that the demand is proper, that there is reasonable cause to believe there may have been a violation of this article and that the information sought or document or object demanded is relevant to the violation, it shall order the person to comply with the demand.") *with id.* § 44–1527(B) ("If the court determines that the attorney general has reasonable cause to believe that the respondent has engaged in, is engaging in or is about to engage in any act ... which is in violation of this article

... the court shall grant the appropriate relief."). Therefore, we believe that the Arizona Supreme Court's discussion of the reasonable cause standard under the Consumer Fraud Act is applicable to the reasonable cause standard under the Uniform State Antitrust Act.

6. Compare "probable cause" with our definition of "reasonable cause" in the context of warrantless arrests: "The requirement, as in so many areas of the law, is one of reason: that it be shown that under the facts and circumstances known to the officer, a reasonable and prudent man in his position would be justified in believing that the suspect had committed the offense." *State v. Lopez*, 22 Utah 2d 257, 451 P.2d 772, 775 (1969).

evidence that there was an illegal agreement or other antitrust violation. Requiring less, they assert, could lead to abuses in the investigative process and would allow the State to engage in "fishing expeditions."

We agree that the State must have some objective evidence that there has been a violation of the antitrust laws. However, as previously mentioned, the purpose of the investigative power is to aid the State in determining whether an enforcement action should even be initiated. The higher protections afforded by higher standards are not necessary because CIDs are part of an investigation rather than an enforcement action. Assuming that the investigation uncovers evidence, the State would initiate a civil action which would require the State to satisfy the higher standards before any sanctions are imposed. The statute therefore gives the State broad discretion to investigate possible antitrust violations while at the same time protecting citizens from investigations not supported by reasonable cause.

■ In light of the aforementioned, the district court clearly erred in concluding that the State failed to meet its burden of showing that reasonable cause existed to warrant investigation of the activities described in the CIDs. The State set forth ample evidence at the hearing to satisfy the reasonable cause standard. To illustrate, the State submitted a certified copy of the articles of organization of DEE Properties, L.L.C. The articles describe the purpose of the company as follows: "To acquire, hold, develop, manage, operate and dispose of interests in real and personal property." Moreover, article IV expressly permits conflict of interest transactions between DEE and any company in which DEE's members have an interest.[7] As the State notes in its brief, the articles would seem to facilitate collusive agreements, and such provisions may have been necessary in light of DEE's influence over a radio station that competed against one of DEE's members.

In addition to the articles of organization, the State submitted the affidavit of an investigator for the Attorney General's office whose factual findings are undisputed and have been set forth earlier in this opinion. In the affidavit, the investigator stated:

> As a result of this preliminary investigation, I concluded that having only two stations that run local advertising, and having a father own the station in one town and having the son working as the general manager of the other station *created a potential for anticompetitive conduct.* Given that we had received a complaint, with specific allegations of improper conduct, I concluded—based on my experience as an antitrust investigator—that further investigation was warranted.

(Emphasis added.) The investigator further concluded that

> joint ownership and management of the only two local radio stations in the broadcast area of Vernal and Roosevelt by Joseph Evans and his son Steve Evans, creates the potential for anticompetitive conduct. Further it appears the association between Joseph Evans and Steve Evans, and their radio stations, has resulted in collusion in the form of illegal price fixing and illegal tying arrangements whereby the purchase of one product (advertising on one station) is tied to the purchase of another product (advertising on the other station).

The affidavit and the DEE articles of organization provide specific evidence that the only two competitors in a well-defined geographic market (1) were owned or managed by father and son, (2) had identical prices, (3) offered discounts for merchants who were willing to advertise on the stations in both towns, and (4) joined in common ownership of land and buildings belonging to two of the radio stations.

---

7. Article IV provides in part:
   No contract or other transaction between the Company and any firm or corporation shall be affected by the fact that a member or manager of the Company has an interest in, or is a director or officer of, such other firm or corporation. Any member or manager, individually or with others, may be a party to, or may have an interest in, any transaction of the Company or any transaction in which the Company is a party or has an interest.

Plaintiffs argue that each one of these facts alone is not sufficient to meet the reasonable cause standard. However, reasonable cause is determined by combining all of the evidence and then determining whether, taken as a whole, there is reasonable cause to believe that the Utah Antitrust Act has been violated. Considering the above evidence as a whole, we hold that the district court clearly erred in concluding that the State failed to show that there was reasonable cause to believe an antitrust violation had occurred.

## II. THE EXEMPTION PROVISION— UTAH CODE ANN. § 76–10–915

We turn next to the second issue— whether the district court erred in concluding that plaintiffs' activities are exempt from investigation under Utah Code Ann. § 76–10–915(1)(a). The Act exempts certain activities from investigation if the activities are "subject to regulation" by the FCC:

(1) No provision of this act shall be construed to prohibit:

(a) The activities of any public utility to the extent that those activities are *subject to regulation* by the Public Service Commission, the state or federal Department of Transportation, the Federal Energy Regulatory Commission, the *Federal Communications Commission*, the Interstate Commerce Commission, or successor agencies[.]

Utah Code Ann. § 76–10–915(1)(a) (emphasis added).

The State argues that the "subject to" language includes only those activities that are actively regulated by the FCC. Because the FCC does not actively regulate pricing for commercial radio advertising, the State argues, plaintiffs' activities are not exempt from the Act. Plaintiffs, on the other hand, assert that the "subject to" language means that any activity that could at some point be regulated by the FCC is exempt from the Act.

Initially, we note that we have serious questions as to whether plaintiffs' radio stations are "public utilities." Neither the State nor plaintiffs briefed the issue, the district court did not make a finding in this regard, the Utah Antitrust Act does not define the term, and the Code's general definition of "public utilities" does not include radio stations.[8] If the radio stations are not public utilities, section 76–10–915 would not apply to the case at bar. Nevertheless, because the issue was neither raised below nor briefed on appeal, we will not make that determination sua sponte. Therefore, while we address the merits of the parties' arguments, we emphasize that we do so without deciding whether plaintiffs' radio stations are public utilities.

When we interpret statutes, our primary goal is to give effect to the legislature's intent in light of the purpose the statute was meant to achieve. *Sullivan v. Scoular Grain Co. of Utah,* 853 P.2d 877, 880 (Utah 1993). We therefore look first to the statute's plain language. *State v. Hunt,* 906 P.2d 311, 312 (Utah 1995) (" 'The best evidence of the true intent and purpose of the Legislature in enacting the Act is the plain language of the Act.' " (citation omitted)); *CIG Exploration, Inc. v. State Tax Comm'n,* 897 P.2d 1214, 1216 (Utah 1995). We need not look beyond its plain language unless we find some ambiguity in it. *Schurtz v. BMW of N. Am., Inc.,* 814 P.2d 1108, 1112 (Utah 1991). Statutory language is ambiguous if it can reasonably be understood to have more than one meaning. *Miller Welding Supply, Inc. v. State Tax Comm'n,* 860 P.2d 361, 362 (Ct.App.1993), *cert. denied,* 870 P.2d 957 (Utah 1994). However, if we find a provision ambiguous, which causes doubt or uncertainty as to its meaning or application, we must analyze the act in its entirety and " 'harmonize its provisions in accordance with the legislative intent and purpose.' " *Beynon v. St. George–Dixie Lodge # 1743,* 854 P.2d 513, 518 (Utah 1993) (quoting *Osuala v. Aetna Life & Casualty,* 608 P.2d 242, 243 (Utah 1980)).

---

**8.** The Code defines "public utilities" to include "every railroad corporation, gas corporation, electrical corporation, wholesale electrical cooperative, telephone corporation, telegraph corpo-ration, water corporation, sewerage corporation, heat corporation, and independent energy producer." Utah Code Ann. § 54–2–1 (Supp.1997).

Looking at the statute's language, we find that the term "subject to regulation" is ambiguous. Construed broadly, the term could encompass any activity over which the FCC has power to regulate, even though at present the FCC has chosen not to regulate the activity. Construed narrowly, the term should include only those activities that the FCC in fact regulates. Because "subject to regulation" carries several plausible connotations, we turn to the legislature's intent and purpose, which it clearly expressed within the Act itself. Section 76–10–912 provides as follows:

> The Legislature finds and determines that competition is fundamental to the free market system and that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic, political and social institutions.
>
> *The purpose of this act is, therefore, to encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce and by providing adequate penalties for the enforcement of its provisions.*

Utah Code Ann. § 76–10–912 (emphasis added).

In light of the Act's clear purpose, we cannot accept plaintiffs' broad construction of the "subject to regulation" language in the exemption provision. Were we to do so, the exemption would effectively vitiate the State's ability to punish anticompetitive behavior in the radio broadcasting business. Stated another way, plaintiffs' interpretation would exempt the entire industry from the Utah Antitrust Act, thereby defeating the Act's purpose as it relates to public utilities.

■ Moreover, we are guided by the widely accepted principle that antitrust laws should be construed broadly and exemptions should be construed narrowly so as to give effect to their purposes. *See Group Life &* *Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 231, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979) ("It is well settled that exemptions from the antitrust laws are to be narrowly construed."); *State v. Scioscia,* 200 N.J.Super. 28, 490 A.2d 327, 333 (1985) (stating that purpose of "public utility" exemption is to prevent business entities from being subjected to conflicting sets of governmental regulations); *Minnesota–Iowa Television Co. v. Watonwan T.V. Improvement Ass'n,* 294 N.W.2d 297, 305 (Minn.1980) ("Since antitrust laws should be broadly construed to effectuate their purpose, such exceptions should be narrowly construed." (citing *Abbott Laboratories v. Portland Retail Druggists Assoc. Inc.,* 425 U.S. 1, 11, 96 S.Ct. 1305, 47 L.Ed.2d 537 (1976))); Alter S. Fogel, Comment, *The 'Superstation,' the NBA, and Antitrust: An Analysis of Chicago Professional Sports Limited Partnership v. National Basketball Association,* 47 Rutgers L.Rev. 1195, 1226 (1995) ("[C]ourts have consistently acknowledged that antitrust exemptions should be construed narrowly.").

■ While the Act does not specify the reasoning behind exempting certain activities from antitrust laws, such reasons are obvious. For example, public utilities are often state or federally sanctioned monopolies. Hence, those anticompetitive activities that have been approved by the state or federal government should not be punished by the Act. Moreover, public utilities are highly regulated by both state and federal agencies. Exempting those activities that are regulated by state agencies avoids conflicts between different governmental bodies. Exempting those activities that are regulated by federal agencies avoids preemption issues. However, "concurrent regulation of the same subject matter is an acceptable arrangement where no conflict [between state and federal regulation] exists." *Sutherland's Statutory Construction,* § 36.08 (5th ed.1993).

The notion that the exemption should be narrowly construed finds further support in the context of other provisions of the Code. For example, the chapter known as "Public

Telecommunications Utility Law"[9] includes corporations operating radio stations in its definition of "telecommunications corporation." Such a corporation means "any corporation or person . . . owning, controlling, operating, managing, or reselling a public telecommunications service." Utah Code Ann. § 54–8b–2(7). The chapter further defines "public telecommunications service" to mean "the transmission of signs, signals, writing, images, sounds, messages, data, or other information of any nature by wire, *radio*, lightwaves, or other electromagnetic means offered to the public generally." *Id.* § 54–8b–2(6) (emphasis added). However, the chapter expressly states, "Nothing in this chapter shall in any way preempt, modify, exempt, abrogate, or otherwise affect any right, cause of action, liability, duty, or obligation arising from any federal, state, or local law governing unfair business practices or antitrust, restraint of trade, or other anticompetitive activity." *Id.* § 54–8b–8.

■■■■■ This chapter clearly indicates the legislature's intent that corporations and persons operating radio stations must comply with the Utah Antitrust Act. If the legislature did not intend to exempt the entire radio broadcasting industry from the Act, the exemption obviously must be construed narrowly to exempt only those activities that are, in fact, regulated by the FCC. Hence, as the State points out in its brief, activities

involving political campaign advertising rates arguably would be exempt from the Act, because they are regulated by the FCC. *See* 47 U.S.C.S. § 315 (1995); 47 C.F.R. § 73.1942 (1996) (requiring that political campaign advertising rates not exceed rates charged to commercial advertisers of radio station). However, given the language of section 54–8b–8, the legislature clearly intended that radio stations comply fully with the Act. Therefore, the State may enforce antitrust violations under the Utah Antitrust Act to the extent that no conflict exists between state and federal law and to the extent that the State is not preempted from doing so by the federal government.

■■■■ In light of the foregoing, we hold that the district court erred in concluding that plaintiffs' radio stations were exempt from investigation by virtue of section 76–10–915(1)(a). We therefore reverse and remand for proceedings consistent with this opinion.

HOWE, C.J., DURHAM, Associate C.J., and STEWART and ZIMMERMAN, JJ., concur in Justice RUSSON's opinion.

■■■■■

9.  *See* Utah Code Ann. §§ 54–8b–1 to –13.