**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 15 2004**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

SHELTER MORTGAGE
CORPORATION,

     Plaintiff - Appellee,

v.

CASTLE MORTGAGE COMPANY,
L.C.; LYNN E. WARDLEY,

     Defendants - Appellants.

No. 02-4037
(D. Utah)
(D.Ct. No. 2:98-CV-160-S)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **BALDOCK**, and **O'BRIEN**, Circuit Judges.

     This is a breach of contract dispute arising out of a failed joint venture

between Castle Mortgage Company, L.C., a Utah limited liability company

(Castle), and Shelter Mortgage Corporation, a Wisconsin corporation (Shelter).

Shelter commenced this diversity action, seeking to recover half of the venture's

losses from Castle and to hold Lynn Wardley, one of the founders and original

---

     [*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

managers of Castle, personally liable for Castle's debts.  Castle and Wardley

appeal the summary judgment granted to Shelter and the entry of judgment against

them, jointly and severally, for $362,352.86.[1]  Exercising jurisdiction under 28

U.S.C. § 1291, we affirm.

## Background

Prior to July 1994, Shelter began negotiations with Wardley to create a

joint venture between Shelter and an entity owned or controlled by Wardley.

Wardley was a successful real estate broker; Shelter was experienced in the

business of originating and funding residential mortgage loans on a wholesale and

retail basis.  The joint venture would conduct a residential mortgage banking

business in the State of Utah.

The negotiations produced a joint venture agreement (Agreement) between

Shelter and Castle.  The Agreement entitled the joint venture "Shelter Mortgage

Company Partnership No. 600" and was dated October 31, 1994.[2]  After twenty-

nine months of operation, Castle elected to terminate the venture pursuant to the

provisions of the Agreement, effective April 20, 1997.  The venture lost

---

[1] This figure represents: $247,870.00 as the principal sum, reflecting fifty percent of the venture's loss; $87,888.86 in pre-judgment interest; and $26,594.00 in attorneys' fees.

[2] During the course of the proceedings in the district court, and continuing throughout this appeal, there has been much debate about when the Agreement was actually signed.  We address the ramifications of this debate later in our discussion.

$495,740.00.  Despite Shelter's demands for payment of half the loss, Castle refused to pay any portion.

On March 9, 1998, Shelter sued Castle, but not Wardley, in the United States District Court for the District of Utah.  Castle counterclaimed and asserted two affirmative defenses:  (1) Wardley was fraudulently induced to enter into the Agreement by Shelter's misrepresentations and assurances that Castle would not incur liability, and (2) Shelter's failure to perform its obligations under the Agreement amounted to a prior material breach excusing Castle's nonperformance.  During the course of the litigation, Shelter was allowed to amend its complaint to assert a claim against Wardley personally for Castle's debts and liabilities.  The new claim was based on the nature of Wardley's business activities on Castle's behalf prior to December 22, 1994, the date Castle's articles of organization were filed.  Wardley and Castle filed an amended answer and counterclaim reasserting fraud and material breach.

In January 2000, the district court granted partial summary judgment for Shelter and against Castle and Wardley.  The district court struck portions of Wardley's affidavit in support of his affirmative defenses, ruling these portions contained impermissible hearsay, legal conclusions and parol evidence.  The district court determined the remaining allegations were insufficient to create a genuine dispute of material fact.  Concluding the Agreement was clear,

unambiguous, and integrated, it held the parties were subject to its terms as written and Castle was liable to Shelter for half the debt. Because Wardley signed the Agreement before Castle's articles of organization were filed,[3] it held Wardley jointly and severally liable for Castle's share of the debts and obligations arising from the Agreement. On March 31, 2000, Shelter moved for an award of pre-judgment interest, attorney's fees and final judgment. On October 17, 2001, Wardley moved to set aside the interlocutory judgment, requested leave to amend his answer and to bring a third party complaint against the lawyers who represented him when forming Castle. The basis for his motion was his alleged discovery that he had not signed the Agreement in October 1994, as he had previously admitted in his answer. He claimed he had forgotten the Agreement was predated. It was only when he saw a letter from his former attorney that he remembered he signed the Agreement after Castle's organization. The court denied Wardley's motion, finding any merit to these claims was clearly outweighed by Wardley and Castle's inexcusable delay and refusal to comply with the court's discovery orders.[4] The district court granted Shelter's motion for

_____

[3] Shelter's amended complaint, filed March 16, 1999, alleged "[a]lthough Wardley executed the Agreement on behalf of Castle on October 31, 1994, Castle did not file its articles of organization with the Utah Division of Corporations and Commercial Code until December 22, 1994." (Appellants' App. at 23.) Castle and Wardley admitted this allegation in their amended answer to Shelter's amended complaint. (*Id.* at 82.)

[4] The district court's rulings were based on Castle and Wardley's "lurid tale of neglect" and the resulting prejudice to Shelter if the district court granted the relief

award of attorney's fees and pre-judgment interest, and entered final judgment.

On appeal, Castle and Wardley argue their affirmative defenses raised material issues of fact, precluding summary judgment. Individually, Wardley contests the district court's decision to hold him personally liable because a factual dispute exists as to whether the parties intended that result. He further maintains that even if he is held personally responsible, his personal liability ceased on the date Castle's articles of organization were filed. Wardley and Castle also dispute the amount of the judgment. Both argue the amount of Castle's initial contribution to the joint venture, in the form of assets as opposed to cash, should have been subtracted from Castle's portion of the loss.

## Standard of Review

We review the district court's summary judgment ruling de novo, employing the same legal principles as the district court and construing the factual record and the reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274

---

requested. (Appellant's App. at 280-89.) In addition, the court found ample evidence to support its initial finding that Wardley signed the Agreement in October 1994 and transacted business prior to filing Castle's articles of organization in December. (*Id.*) In his opening brief, Wardley did not challenge the district court's factual ruling or offer legal argument. Instead, he merely announced in his statement of facts that he did not sign the Agreement until December 22, 1994. Failure to raise an issue in the opening brief waives that issue. *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1994). Thus, any issue regarding the date Wardley signed the Agreement is waived and this question of fact resolved.

(10th Cir. 1998); *Kane v. Capital Guardian Trust Co.*, 145 F.3d 1218, 1221 (10th Cir. 1998). Summary judgment is appropriate if the record shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "If our inquiry reveals no genuine issue of material fact in dispute, then we review the case to determine if the district court correctly applied the substantive law." *Gamble, Simmons & Co. v. Kerr-McGee Corp.*, 175 F.3d 762, 766 (10th Cir. 1999) (citing *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir. 1996)).

## Discussion

The district court determined Wardley and Castle's affirmative defenses were insufficient to avoid summary judgment. We agree.

*Fraud*

Castle and Wardley asserted Wardley was fraudulently induced to enter into the Agreement by Shelter's misrepresentations and assurances that Castle would incur no liability. The factual linchpin of the fraud accusation is Wardley's affidavit, and specifically, the portions struck by the district court. In it, he echoes the allegations in the counterclaim describing false representations made by Shelter, reasonable reliance on those representations, and damage resulting therefrom. Wardley and Castle argue the allegations, as they appear in the affidavit, should have been admissible parol evidence and considered when

-6-

determining the fraud claim.

Admissibility of a summary judgment affidavit is an evidentiary question.

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894-95 (1990).

> We review a district court's decision to exclude evidence at the
> summary judgment stage for abuse of discretion. Under this standard
> we will not disturb the district court's decision 'unless [we have] a
> definite and firm conviction that the lower court made a clear error
> of judgment or exceeded the bounds of permissible choice in the
> circumstances.'

*Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1016 (10th Cir. 2002) (quoting *United States v. Ortiz*, 804 F.2d 1161, 1164 n.2 (10th Cir. 1986)).

"The parol evidence rule is a rule of substantive law. Under the doctrine of *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188 (1938), we must apply state law." *Elec. Dist., Inc. v. SFR, Inc.*, 166 F.3d 1074, 1082, n.3 (10th Cir. 1999). Consequently, we look to Utah law for instruction. Generally, the parol evidence rule in Utah operates "to exclude evidence of contemporaneous conversations, representations, or statements offered for the purpose of varying or adding to the terms of an *integrated* contract." *Hall v. Process Instruments & Control, Inc.*, 890 P.2d 1024, 1026 (Utah 1995). "If a contract is unambiguous, the intentions of the parties must be determined [solely] from the words of the agreement." *Lee v. Barnes*, 977 P.2d 550, 552 (Utah Ct. App. 1999). However, when determining whether an agreement is integrated the court must consider all admissible evidence. *Hall*, 890 P.2d at 1026.

Even if a contract is otherwise integrated, parol evidence is admissible when the evidence is offered to show fraud in the inducement. *Union Bank v. Swenson*, 707 P.2d 663, 667 (Utah 1985). In *Union*, the Utah Supreme Court stated:

> If a parol contemporaneous agreement be the inducing cause of the written contract, or forms a part of the consideration therefor, and it appears the writing was executed on the faith of the parol agreement or representation, extrinsic evidence is admissible. *In such cases, the real basis for its admission is to show fraud.*

*Id*.

The trial court struck "offending portions" of Wardley's affidavit containing "inadmissable [sic] hearsay, assertions barred by the parol evidence rule, and impermissible legal conclusions . . . ." (Appellants' App. at 120.) It did not specifically identify which portions were struck and why. It also made its ruling *prior to* considering whether the Agreement was integrated and prior to considering Wardley's claim of fraud. As a result, while the district court correctly struck inadmissible hearsay and inadmissible legal conclusions, admissible evidence barred only by the parol evidence rule should have been considered for the limited purposes of the fraud in the inducement claim.

Nonetheless, Wardley and Castle's fraud claim fails. In his affidavit, Wardley contends Shelter promised that "Castle would not incur any debts or liabilities as a result of the Agreement," Shelter had "experience and expertise"

which would preclude losses, and Castle's contribution could be made "in kind." (Appellants' App. at 99-100.) Even if true, in light of the express terms of the Agreement, these allegations fail to establish Wardley's reasonable reliance on pre-Agreement promises.

While reasonable reliance is usually a question of fact for the jury, *Armed Forces Ins. Exch. v. Harrison*, 70 P.3d 35, 45 (Utah 2003), under Utah law "a party cannot reasonably rely upon oral statements by the opposing party in light of contrary written information." *Gold Standard, Inc. v. Getty Oil Co.*, 915 P.2d 1060, 1068 (Utah 1996). The Utah Supreme Court explained:

> The one who complains of being injured by such a false representation cannot heedlessly accept as true whatever is told him, but has the duty of exercising such degree of care to protect his own interests as would be exercised by an ordinary, reasonable and prudent person under the circumstances; and if he fails to do so, is precluded from holding someone else to account for the consequences of his own neglect.

*Id.* (quotation marks omitted).

The written Agreement precludes any claim of reasonable reliance on Shelter's oral statements. Castle and Wardley fail to identify any provision in the Agreement implying ambiguity as to the parties' intent. The Agreement contains an integration clause with an express disclaimer of reliance on any representations outside of the written Agreement. Section 12.7, entitled "Integration," reads in part:

The making, execution and delivery of this Agreement by the parties hereto have been induced by no representations, warranties, statements, agreements other than those expressed in this Agreement. This Agreement embodies the entire understanding of the parties, and there are no further or other agreements or understandings, written or oral, in effect between the parties relating to the subject matter hereof . . . .

(Appellants' App. at 243.) In addition, the Agreement clearly requires an initial capital contribution of $25,000 from each venturer and allocates net profits and losses equally between Castle and Shelter.

Because the Agreement explicitly states it is an integrated document, warrants the parties did not rely on oral representations, and expressly allocates potential losses equally, the element of reasonable reliance is absent and Castle and Wardley's fraud claim disintegrates.

*Excused Performance*

Wardley and Castle next assert Shelter's failure to perform its obligations under the Agreement is a material breach excusing Castle's nonperformance. Specifically, they allege Shelter failed to: (1) prepare and submit a business plan for the joint venture's operations for the first two fiscal years; (2) prepare and deliver an initial operating budget, including projections for all operating costs and expenses to be included for the first fiscal year; (3) limit expenditures and/or obligations solely to those approved in the operating budget and/or business plan; and (4) provide Castle and Wardley with reports and information, and generally

keep them fully apprised as to the joint venture's business and operations.

A material breach of contractual obligations may justify non-performance by the other party. *Coalville City v. Lundgren*, 930 P.2d 1206, 1209 (Utah Ct. App.) (a material breach by one party to a contract excuses further performance by the non-breaching party). "What constitutes a material breach is a question of fact." *Id*. Even so,

> [i]t is not every minor failure, which could otherwise be remedied, which will justify non-performance. It must be something so substantial that it could be reasonably deemed to vindicate the other's refusal to perform; and this is a matter of affirmative excuse or justification, which the party so claiming has the burden of demonstrating.

*Zion's Prop., Inc. v. Holt*, 538 P.2d 1319, 1321 (Utah 1975). Shelter argues its failure to perform does not rise to a material breach. However, even were we to assume Shelter's breach was material, Castle's non-performance is still not excused.

The district court correctly concluded that Castle and Wardley could not assert an affirmative defense of excused performance under the principles of "waiver and/or estoppel." (Appellants' App. at 123.) A party claiming a right to performance cannot "acquiesce in non-performance by the other party until the time has gone by for such performance and then claim damages." *Larsen v. Knight*, 233 P.2d 365, 372 (Utah 1951). The basis for this principle lies in the concepts of waiver and estoppel.

-11-

> Waiver is the intentional relinquishment of a known right. In order for waiver to occur, there must be an existing right, benefit or advantage, a knowledge of its existence, and an intention to relinquish it. The party's actions or conduct must evince unequivocally an intent to waive, or must be inconsistent with any other intent. Whether a right has been waived is generally a question of fact and therefore we accord considerable deference to the finder of fact's determination. Findings of fact will be affirmed unless clearly erroneous, that is, unless they are against the clear weight of the evidence or we are definitely and firmly convinced the trial court made a mistake.

*Mont Trucking, Inc. v. Entrada Indus., Inc., Interstate Brick Div.*, 802 P.2d 779, 781 (Utah Ct. App. 1990) (citations and quotation marks omitted).

> Estoppel is conduct by one party which leads another party, in reliance thereon, to adopt a course of action resulting in detriment or damage if the first party is permitted to repudiate his conduct. To find estoppel, three elements must be present: (1) a representation, act, or omission, (2) justifiable reliance, and (3) a change of position to one's detriment based on that reliance. [I]t should be noted that estoppel [also] presents a question of fact.

*Id*. at 782 (citations and quotation marks omitted).

Although Shelter did not provide Castle with reports, plans and financial documents, there is no evidence Castle gave Shelter notice of its alleged breach or even requested the omitted documents. In fact, Wardley admitted he was not concerned about Shelter's failure to provide such documentation. Accepting Wardley's testimony on this point as true, it is clear Castle was well aware of Shelter's failure to provide documents but did nothing because it was not concerned about the situation. Such conduct unequivocally evinces an intent to waive this contractual benefit and justified Shelter's reliance on this waiver in

-12-

failing to produce the documentation required. Thus, Wardley and Castle are estopped from asserting an affirmative defense of excused performance. Having resolved Castle and Wardley's arguments regarding material breach and fraud, we now turn to Wardley's claim that the district court erred in holding him personally liable for Castle's entire share of the joint venture's losses.

*Liability*

At the time Castle submitted its articles of organization, the relevant law concerning limited liability companies provided in pertinent part:

> A limited liability company may not transact business or incur indebtedness, except that which is incidental to its organization or to obtaining subscriptions for or payment of contributions, until the articles of organization have been filed with the division. Persons engaged in prefiling activities other than those authorized by this section shall be jointly and severally liable for any debts or liabilities incurred in the course of those activities. . . .

Utah Code Ann. § 48-2b-118(3) (1994).[5]

We have found no Utah law addressing the parameters of an organizer's

---

[5] The Utah Limited Liability Company Act, formerly found under the Partnerships section of the Utah Code, was recodified, effective July 1, 2001, as the Utah Revised Limited Liability Company Act, which now appears in Title 48, Chapter 2c. The prohibition on prefiling activities is now found in Utah Code Ann. § 48-2c-404; the resulting joint and several liability is now found in Utah Code Ann. § 48-2c-602(1) ("All persons who assume to act as a company without complying with this chapter are jointly and severally liable for all debts and liabilities so incurred, except for debts incurred in the course of prefiling activities authorized under Section 48-2c-404."), and § 48-2c-602(4) ("Persons engaged in prefiling activities other than those authorized by Section 48-2c-404 shall be jointly and severally liable for any debts or liabilities incurred in the course of those activities.").

personal liability arising from prohibited pre-organization activities under this statute. There is, however, precedent with regard to a corporate promoter's liability for prohibited pre-incorporation transactions. It is a matter of first impression whether this precedent is applicable to claims under Utah's Limited Liability Company Act. We conclude that, under the circumstances before us, such precedent is relevant.

A limited liability company (LLC) is a hybrid of two basic business entities. It "combines the organizational flexibility and pass-through tax treatment of a partnership with the limited liability protection of a corporation." 1A William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations § 70.50 (perm. ed. 2002). Courts interpreting LLC statutes or agreements will generally focus on the particular aspect of the LLC giving rise to the problem, and then take guidance from the principles and precedent of the business entity (corporation or partnership) most analogous to the problem before it. *See* David M. Hastings, Annotation, *Construction and Application of Limited Liability Company Acts*, 79 A.L.R. 5th 689, 703-04 (2000) (and cases cited therein).

For example, in *Ditty v. CheckRite, Ltd., Inc.*, 973 F. Supp. 1320, 1335 (D. Utah 1997), the district court determined that the members of an LLC are protected from liability in much the same way as corporate shareholders. It

therefore applied Utah corporate law in deciding whether the concept of "piercing the corporate veil" would apply to a limited liability company.[6] *Id.*

Accordingly, if it is necessary to go outside the plain language of Utah Code Ann. § 48-2b-118(3) to determine the existence and extent of Wardley's personal liability, we will be guided by Utah's corporate law. Clearly, the statute places joint and several liability on anyone who engages in prohibited pre-filing transactions. However, as a general rule, promoters will not be held personally liable "if it is understood that the other party shall look to the corporation only, provided the contract is one adoptable by the corporation." Fletcher Cyc Corp § 215 (and cases cited therein). Wardley argues the Agreement, if interpreted to reflect the intention of the parties, demonstrates the parties chose to form the joint venture with an LLC. In his view, because an LLC by its nature protects managers from exposure to personal liability, and Shelter did not request a personal guarantee from him, the Agreement raises an issue of fact as to his personal liability. In essence, Wardley is arguing Shelter's knowledge and conduct estops it from looking outside the LLC for payment on the corporate debt

---

[6] "Deference is to be accorded the views of a resident federal district judge with respect to the interpretation and application of the law of his state absent controlling precedents held by the highest court of that state." *Loveridge v. Dreagoux*, 678 F.2d 870, 877 (10th Cir. 1982).

-15-

—essentially, an "LLC by estoppel" argument.[7]

Applying Utah corporate law, Wardley's argument fails. The Agreement's identification of an LLC as the contracting party does not eliminate individual liability. *American Vending Services, Inc. v. Morse*, 881 P.2d 917, 927 (Utah Ct. App. 1994).

In *American Vending*, sellers negotiated with two individuals for the sale of a car wash to a corporation. *Id*. at 918. At the time of the purchase, the sellers knew the corporate entity, American Vending Services, Inc., would purchase and operate the car wash. *Id*. However, when the parties executed the contract for sale, American Vending's attempts to file its articles of incorporation had not been successful. *Id*. The articles were finally filed approximately five weeks later. *Id*. The corporation operated the business for approximately three years but did not thrive, and in fact, eventually allowed the bank to foreclose on it. *Id*. at 918-19. During that time, the corporation failed to make payments to the sellers. *Id*. at 919. As a result, the sellers sued both the corporation and the individuals. *Id*. at 918. The individuals countered they were not personally liable because the

---

[7] Common law recognized three types of corporations: de jure, de facto or by estoppel. *American Vending*, 881 P.2d at 920. Generally, a de jure corporation is one created in compliance with all the requirements of the governmental entity. *Id*. A de facto corporation is created when a bona fide attempt to incorporate has been made, but the efforts are not in complete compliance with the requisite governmental standards. *Id*. Corporations by estoppel are created when the parties, by their "agreements or conduct," estop themselves from denying the existence of the corporation. *Id.*

-16-

sellers knew the corporation was to be the business' purchaser and operator, a good faith attempt to incorporate was made prior to the sale, and incorporation was completed shortly after signing the purchase contract. *Id*. at 919.

The Utah Court of Appeals considered their defense under both the concept of a "de facto" corporation and corporation by estoppel. It held that both concepts were abrogated by the passage of Utah Code Ann. § 16-10-51 (1989). With regard to the concept of corporation by estoppel, the court noted:

> The so-called estoppel that arises to deny corporate capacity does not depend on the presence of the technical elements of equitable estoppel, viz., misrepresentations and change of position in reliance thereon, but on the nature of the relations contemplated, that one who has recognized the organization as a corporation in business dealings should not be allowed to quibble or raise immaterial issues on matters which do not concern him in the slightest degree or affect his substantial rights.

*Id*. at 923. Although the court recognized the equitable nature of an estoppel claim, the majority concluded the statute's designation of corporate existence as the time the certificate of incorporation is issued, coupled with the unambiguous wording of the statute, compelled them to find the legislature abrogated corporation by estoppel. *Id*. at 927 (Garff, J., concurring). Accordingly, the individuals were held jointly and severally liable "for all the debts and liabilities that they incurred or that arose as a result of their actions before the corporation legally existed." *Id*. at 923.

-17-

Similar to the Utah Business Corporations Act in *American Vending*, the Utah Limited Liability Company Act at the time of the Agreement clearly defined the moment of a limited liability company's existence. *See* n.5. "Upon the placement of a stamp or seal, as provided in Subsection 48-2b-117(1)(a), on the articles of organization, the limited liability company shall be considered organized." Utah Code Ann. § 48-2b-118(1) (1994).[8] The provision regarding the liability of the individual acting before the limited liability company's existence is just as clear. "Persons engaged in prefiling activities other than those authorized by this section shall be jointly and severally liable for any debts or liabilities incurred in the course of those activities." Utah Code Ann. § 48-2b-118(3) (1994). Thus, applying the reasoning of the Utah court in *American Vending*, "incorporation by estoppel" was abrogated by the passage of the Utah Limited Liability Company Act and is unavailable to promoters of an LLC wishing to avoid personal liability for prohibited pre-filing transactions. Therefore, the district court did not err in holding Wardley personally liable under the Agreement for the consequences of his pre-organization contract.

But that does not end the debate. A good portion of oral argument in this case questioned the extent of Wardley's liability for Castle's share of the

_____

[8] The Revised Act now states the time of formation is "the time, day, month, and year indicated by the division's stamp or seal on the articles of organization." Utah Code Ann. § 48-2c-402(3) (2001).

venture's losses. The district court applied the holding of *American Vending*, resulting in Wardley's personal liability for Castle's entire share of the venture's losses, with debts and obligations incurring from October 31, 1994, through April 20, 1997. Wardley argues he should be held personally liable only for Castle's share of the loss incurred between October 31, 1994, and the date Castle was legally formed, December 22, 1994.

In support of this argument, Wardley acknowledges the extent of the personal liability attributable to the individuals in *American Vending* was unaffected by the date the articles of incorporation were actually filed, but contends the Utah courts have never issued a similar ruling involving LLC's. Instead, he points to *Steenblik v. Lichfield*, 906 P.2d 872 (Utah 1995), and *Murphy v. Crosland*, 915 P.2d 491 (Utah 1996). In both cases, individuals were held personally liable for debts incurred on behalf of the corporation while the corporation was suspended.[9] *Murphy*, 915 P.2d at 494; *Steenblik*, 906 P.2d at 878. Although in neither case did the corporation achieve reinstatement, Wardley nonetheless maintains the courts' holdings imply personal liability would have been limited to the date the corporation reinstated its status with the State.

We reach a different conclusion. The holding in *Steenblik* states:

---

[9] "Suspension is a temporary restriction on the corporation's authority and functions that renders the corporation powerless or unable to continue its normal operations." *Steenblik*, 906 P.2d at 877 (footnote omitted).

-19-

As to corporations that have been suspended and not reinstated, we hold that officers and directors who continue the business of a suspended corporation are personally liable for all debts and liabilities arising from those operations that are a continuation of the types of activities the corporation performed. Under such circumstances, the relationship of persons who continue the operations of a suspended corporation is like the relationship of preincorporation promoters, which is essentially that of partners. Thus, persons who act as if pursuant to valid corporate authority, after that authority has been suspended, are personally responsible for liabilities arising from the continued operations.

906 P.2d at 878. In reaching its decision, the court discussed whether reinstatement would limit the individuals' liability. *Id*. at 877-78. It endorsed the majority view, declining to "automatically eliminate personal liability upon reinstatement." *Id.* at 878. Because Wardley signed the Agreement prior to incorporation agreeing to receive half the profit or pay half the losses, *Murphy* and *Steenblik* do not assist Wardley.

Wardley cites no Utah case law which limits a promoter's liability on a contract merely by completing incorporation. While a different result may be obtained in other jurisdictions, such precedent would be squarely in conflict with *American Vending*. Neither has Wardley submitted any evidence of a novation, i.e., Shelter agreed to release him of personal liability after the contract was adopted by Castle. Fletcher Cyc Corp § 216 (2002) ("The consent of all parties, being essential to a novation in any case, is essential to a novation under which promoters seek to be relieved from personal liability on their contracts."). We

-20-

find *American Vending* controlling in this instance and affirm the district court's conclusion that Wardley must be held jointly and severally liable with Castle for Castle's entire share of the losses.

As a final argument, Wardley and Castle contend the amount of their liability should be reduced by the value of their capital contribution. This issue is not contained in the opening brief. It is only when we read Wardley and Castle's reply brief that we become apprised of their contention that their liability should be reduced by the value of their goodwill contribution.

An issue not raised in the opening brief is waived. *State Farm*, 31 F.3d at 984 n.7. To "review issues raised for the first time in a reply brief . . . robs the appellee of the opportunity to demonstrate that the record does not support an appellant's factual assertions . . . ." *Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000). Consequently, in the interests of principle and fairness, we decline to consider this argument.

The district court's judgment in favor of Shelter is **AFFIRMED**.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge

No. 02-4037, <u>Shelter Mortgage Corporation v. Castle Mortgage Company, L.C.</u>

**LUCERO**, Circuit Judge, concurring in part and dissenting in part.

Because I agree with the majority decision affirming the district court's grant of partial summary judgment to Shelter on its breach of contract claim, I join that aspect of the majority opinion.[1] However, I disagree with the conclusion that limiting Wardley's personal liability to debts and liabilities incurred in the course of prohibited prefiling activities "would be squarely in conflict" with Utah's Business Corporation Act ("BCA") precedent. Slip op. at 21. It is this disagreement that presents the basis of this dissent.

The majority acknowledges that it "found no Utah law addressing the parameters of an organizer's personal liability arising from prohibited pre-organization activities" under Utah Code Ann. § 48-2b-118(3) (1994). <u>Id.</u> at 14. Presented with this "matter of first impression," <u>id.</u> - whether BCA precedent is applicable to claims under Utah's Limited Liability Company Act ("LLCA") - the majority proceeds to interpret the LLCA to impose personal liability on Wardley for Castle's debts and liabilities incurred after the prefiling period. Yet, the BCA has no analogous provision to the relevant LLCA provision in this case, and accordingly, the LLCA's plain language, not BCA precedent, should control our decision.

---

[1] The contract at issue is a partnership agreement subject to partnership accounting principles, under which earnings, debts, and liabilities are stated as of the time they are earned or incurred.

American Vending Servs., Inc. v. Morse, 881 P.2d 917 (Utah Ct. App. 1994), decided by the Utah Court of Appeals, forms the predicate of the majority opinion. The American Vending court held that "section 16-10-139 [of the BCA] imposes joint and several liability" on corporate promoters for the full extent of the corporation's debts and liabilities arising from prohibited pre-incorporation activities without regard to subsequent incorporation. Section 16-10-139, which has since been repealed, stated: "All persons who assume to act as a corporation without authority so to do shall be jointly and severally liable for all debts and liabilities incurred or arising as a result thereof." This statutory provision does not distinguish between prohibited prefiling activities and general misrepresentation of corporate existence. Utah Supreme Court precedent confirms this reading. See Steenblik v. Lichfield, 906 P.2d 872, 878 (Utah 1995) ("nothing in Utah's statutory history suggests that § 16-10-139 is limited to preincorporation activities."). Because the Utah state legislature has not distinguished actions taken during the prefiling period from other forms of misrepresentation, Utah courts impose the same personal liability under both circumstances.

By contrast, the LLCA, which provided the relevant law at the time Castle and Shelter entered into the joint venture agreement, explicitly distinguishes between persons engaged in prohibited prefiling activities and persons generally

-2-

acting as an LLC in contravention of the statute. One provision of the LLCA is substantially similar to § 16-10-139 of the BCA, the statute interpreted by American Vending. That provision of the LLCA states: "All persons who assume to act as a limited liability company without authority granted by the division to do so are jointly and severally liable for all debts and liabilities so incurred." § 48-2b-110.

However, § 48-2b-110 is <u>not</u> the statutory provision governing our determination in this matter. Rather, the state legislature has distinguished prohibited prefiling activities from other activities when it provides that, "[p]ersons engaged in prefiling activities other than those authorized by this section shall be jointly and severally liable for any debts or liabilities incurred <u>in the course of those activities</u>." § 48-2b-118(3) (emphasis added). By its terms, this provision limits personal liability to debts and liabilities incurred while engaging in prohibited prefiling activities. Section 48-2b-118(3) finds no compatriot in the BCA, and therefore neither <u>American Vending</u>, nor any other BCA precedent, controls our interpretation of § 48-2b-118(3). While the legislature explicitly distinguished between prefiling activities and general misrepresentation in the LLCA, it chose not to differentiate the extent of personal liability for misrepresenting corporate existence in the BCA.

While the LLCA contains a separate provision pertaining to prefiling

activities, Utah's BCA does not contain a counterpart affecting such prefiling activities. Under the LLCA, a promoter is personally liable for debts or liabilities incurred "in the course of" prefiling activities. By contrast, the BCA extends a corporate promoter's liability both to debts and liabilities incurred in prohibited pre-incorporation activities, as well as debts and liabilities "arising as a result" of those activities. Given that the LLCA explicitly distinguishes between persons acting as an LLC in contravention of that Act and those engaged in prohibited prefiling activities, and that Utah's BCA does <u>not</u> make a similar distinction, only one conclusion flows logically: the LLCA and the BCA are sufficiently dissimilar on this point such that precedent regarding the latter cannot compel a result under the former.

We turn then to the statutory language of the LLCA, which provides us with our only guide in construing § 48-2b-118(3). This section limits personal liability to liability "for any debts or liabilities incurred in the course of those activities." § 48-2b-118(3). "Those" refers to "prefiling activities other than those authorized by this section. . . ." <u>Id.</u> By its plain meaning, § 48-2b-118(3) limits a promoter's personal liability to liabilities incurred during the period of time the individual engaged in prohibited prefiling activities.

Pursuant to Utah's principles of statutory interpretation, we look first to the plain language of the statute. <u>See</u> <u>Evans v. State</u>, 963 P.2d 177, 184 (Utah 1998).

-4-

We "assume that each term . . . was used advisedly; thus the statutory words are read literally, unless such a reading is unreasonably confused or inoperable." Johnson v. Redevelopment Agency, 913 P.2d 723, 727 (Utah 1995) (internal citations omitted). "Course," in turn, has a plain meaning. It clearly means the length of time over which a process extends - duration.

Because the "course" of prefiling activities extends to that period of time preceding the filing of articles of organization, I would hold that Wardley is jointly and severally liable for all of Castle's debts and liabilities incurred prior to December 22, 1994, the date Castle's articles of organization were filed. I cannot agree, as the majority proposes to hold, that Wardley is liable for Castle's debts and liabilities incurred after Castle filed its articles of organization.